1  DAVID P. BEITCHMAN (SBN 198953)
   dbeitchman@bzlegal.com
2  ANDRE BONIADI (SBN 266412)
   aboniadi@bzlegal.com
3  **BEITCHMAN & ZEKIAN, P.C.**
   16130 VENTURA BLVD., SUITE 570
4  ENCINO, CALIFORNIA 91436
   TELEPHONE: (818) 986-9100
5  FACSIMILE:  (818) 986-9119

6  *Attorneys for Plaintiff,*
   TONY MARRONE, THE MARRONE FAMILY
7  2007-1 IRREVOCABLE LIFE INSURANCE TRUST-2,

8

9              **UNITED STATES DISTRICT COURT**

10            **CENTRAL DISTRICT OF CALIFORNIA**

11

12  TONY MARRONE, as the          )  **Case No.** CV13- 6368 SJO (EX)
    TRUSTEE OF THE  MARRONE       )
13  FAMILY 2007-1  IRREVOCABLE    )  COMPLAINT FOR:
14  LIFE INSURANCE TRUST-2;       )
                                  )
15                                )     1. DECLARATORY RELIEF
            Plaintiff,            )     2. INJUNCTIVE RELIEF
16                                )     3. FRAUD
                                  )     4. UNFAIR BUSINESS
17       vs.                      )        PRACTICES
18                                )     5. ELDER ABUSE
    IMPERIAL HOLDINGS, INC.;      )
19  IMPERIAL PREMIUM FINANCE,     )
    LLC; IMPERIAL LIFE           )  JURY DEMAND
20  SETTLEMENTS, LLC; PORTFOLIO   )
    FINANCIAL SERVICING           )  Judge:
21  COMPANY, LLC; BANK OF UTAH;   )
22  THE LINCOLN NATIONAL LIFE     )
    INSURANCE COMPANY; and        )
23  DOES 1 through 10, inclusive, )
24                                )
                                  )
25          Defendants.           )
26  _____)

27

28

- 1 -

**COMPLAINT FOR DAMAGES**

1      Plaintiff, Tony Marrone (hereafter from time to time "Marrone"), in his
2  capacity as the individual trustee of The Marrone Family 2007-1 Irrevocable Life
3  Insurance Trust-2 (from time to time the " Marrone Trust", by and through their
4  attorneys, hereby files their Complaint against Defendants Imperial Holdings, Inc.
5  sometimes doing business as Imperial Trade and Finance, Imperial Premium Finance,
6  LLC, Imperial Life Settlements, LLC, Portfolio Financial Servicing Company, LLC,
7  Bank of Utah, The Lincoln National Life Insurance Company, and DOES 1 through
8  10, and in doing so allege as follows:

9

10                           **THE PARTIES**

11      1.     This is an action brought for Declaratory Judgment under 28 U.S.C.
12  §2201 and Rule 57 of the Federal Rules of Civil Procedure as well as for other relief
13  in which the Plaintiff seek a determination as to their rights and interests in a $2.1
14  million life insurance policy, policy no. JF-5565795 (the "Policy"), put in force in or
15  around June 27, 2007, and ultimately issued by The Lincoln National Life Insurance
16  Company ("Lincoln"). The Policy was purchased by Marrone insuring the life of his
17  wife, Veneice Williams Marrone, and ultimately ownership of the Policy was
18  transferred to the Marrone Trust. As set forth in detail below, sometime after the
19  initial purchase of the Policy, the premiums for said Policy were thereafter financed
20  by Defendant Imperial Premium Finance, LLC ("IPF"), an entity wholly owned by
21  Defendant Imperial Holdings, Inc. ("IHI").

22      2.     Ultimately and as a result of the financial transaction and related
23  transactions and conduct of Defendants as set forth in greater detail herein and
24  throughout, ownership in the policy was transferred to Portfolio Financial Servicing,
25  LLC ("PFS"), an entity also owned wholly by IHI. IHI, by and through its ownership
26  of and affiliation with IPF and the related Imperial Defendants (collectively the
27  "Imperial Entities") contend that they are the owners of the Policy and or have
28  asserted dominion and control over the Policy so as to deprive the Plaintiff of the

**COMPLAINT FOR DAMAGES**

ownership and benefits of the Policy.  Plaintiff is trustee of the Marrone Trust and in that capacity is required to marshal the assets of the Trust for distribution upon the death of the Trustor.  Plaintiff, on the other hand, contends that the Marrone Trust owns the Policy, and that the Imperial Entities' interest in said Policy is limited to the amount owing for the premium financing provided by IPF, and that the Imperial Entities have no interest in the Policy whatsoever beyond the financing amount.

3.     Plaintiff further contends that the Imperial Entities' conduct violates their rights and interest in the Policy, and that their assertion of dominion and control over the Policy and the benefits therein constitutes a fraud, unfair business practice and elder abuse, among other claims.   Thus an actual controversy of a justiciable nature concerning the rights and obligations of the parties in and to the Policy currently exists.

4.     The Marrone Trust is a duly formed and executed Trust created in 2007 in the County of Los Angeles, State of California.

5.     Plaintiff Tony Marrone is a citizen of the State of California residing in the county of Los Angeles, State of California.  Mr. Marrone brings this action not only in his individual capacity but in his capacity acting as the individual trustee of The Marrone Family 2007-1 Irrevocable Life Insurance Trust-2.

6.     Defendant Imperial Holdings, Inc (IHI) is a corporation being organized and existing under the laws of the State of Delaware, with its principal offices in Boca Rattan, Florida.  Plaintiff is informed and believes and thereon alleges that IHI is authorized to engage in, and that IHI regularly does engage in, business in California, County of Los Angeles.   Defendant IHI sometimes did and does business as an entity entitled "Imperial Trade and Finance," a business entity form unknown.

7.     Defendant Imperial Premium Finance, LLC ("IPF"} is a limited liability company, being organized and existing under the laws of the State of Delaware, with its principal offices in Boca Rattan, Florida.   Plaintiff is informed and believes and thereon alleges that IPF is authorized to engage in, and that IPF regularly does engage

1  in, business in California, County of Los Angeles. Plaintiff is further informed and
2  believes and thereon alleges that Defendant IPF is wholly owned and or controlled by
3  Defendant IHI.

4      8.    Defendant Imperial Life Settlements, LLC ("ILS") is a limited liability
5  company, being organized and existing under the laws of the State of Delaware, with
6  its principal offices in Boca Rattan, Florida. Plaintiff is informed and believes and
7  thereon alleges that ILS is authorized to engage in, and that ILS regularly does engage
8  in, business in California, County of Los Angeles. Plaintiff is further informed and
9  believes and thereon alleges that Defendant ILS is wholly owned and or controlled by
10  Defendant IHI.

11      9.    Defendant Portfolio Financial Servicing Company, LLC ("PFS") is a
12  limited liability company, being organized and existing under the laws of the State of
13  Delaware, with its principal offices in Boca Rattan, Florida. Plaintiff is informed and
14  believes and thereon alleges that PFS is authorized to engage in, and that PFS
15  regularly does engage in, business in California, County of Los Angeles. Plaintiff is
16  further informed and believes and thereon alleges that Defendant PFS is wholly
17  owned and or controlled by Defendant IHI.

18      10.   Plaintiff is informed and believes and thereon alleges that at all times
19  mentioned in this Complaint, IHI, and the remaining Imperial Entities, including but
20  not limited to PFS, ILS, and IPF, were and are the alter ego of each of the Imperial
21  Entity Defendants, and that at all times herein mentioned there existed such a unity of
22  interest in ownership between said Imperial Entity Defendants that any separateness
23  has ceased to exist between them because (i) the Imperial Entity Defendants have
24  commingled and used the assets of the other for their own benefit and have caused the
25  assets of the Imperial Entity Defendants to be transferred internally and to others
26  without adequate consideration; and (ii) the IHI Defendant has exercised complete
27  dominance and control over the Imperial Entities, and their respective properties and
28  assets, such that the Imperial Entities are mere shells and instrumentalities for the

- 4 -

1  conduct of the business and activities of IHI. Adherence to the fiction of a separate
2  existence of the Imperial Entities would sanction fraud and permit an abuse of the
3  legal benefits of true business entities.

4      11.    Defendant Bank of Utah is a citizen of the state of Utah and is a Utah
5  state chartered commercial bank with its principal place of business in Ogden, Utah.
6  Bank of Utah is the purported corporate trustee of the Marrone Trust.  In acting in said
7  capacity, Bank of Utah did and does in fact engage in business within the State of
8  California.

9      12.    Defendant The Lincoln Life Insurance Company ("Lincoln"} is a citizen
10  of Indiana, being a life insurance company organized and existing under the laws of
11  the State of Indiana, with its principal place of business located at 1300 South Clinton
12  Street, Fort Wayne, Indiana 46802.

13

14                    **JURISDICTION AND VENUE**

15      13.    This Court has jurisdiction over this matter pursuant to 28 U.S.C.
16  §1332(a), insofar as this is an action between citizens of different states and the matter
17  in controversy exceeds the sum of $75,000, exclusive of interest and costs.

18      14.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a
19  substantial part of the events giving rise to the claim occurred and continues to occur
20  in the Central District of California, and Defendants and/or their agents may be found
21  in the Central District of California.

22

23                      **INITIAL ALLEGATIONS**

24      15.    Plaintiff Tony Marrone is trustee of the Marrone Trust; Marrone's four
25  children are the beneficiaries of the $2.1MM Policy purchased by Marrone on the life
26  of his spouse, Veneice Williams Marrone. Tony Marrone is 88 years old.  Initially, in
27  and around June 2007, Marrone purchased the Policy himself in his individual
28  capacity; however, after many months, and for estate planning and taxation purposes,

Marrone transferred the Policy to the Marrone Trust. After the transfer, Marrone was still the owner of the policy, and his ownership therein changed simply to that in his capacity as the Trustee of the Marrone Trust. At all times relevant thus far, Marrone was entitled to the benefits of the Policy, specifically the financial benefits upon maturity of the Policy.

16.    In or around January 2008 Marrone entered into a series of discussions with insurance professionals and financial advisors related to financing options available with respect to the policy. Specifically, Marrone was advised that in fact subsequent premium obligations to keep the policy in force could be made by a premium finance company, such as IHI and the Imperial Entities. Throughout the course of said negotiations and discussions, Plaintiff and his representatives had many conversations with Imperial representatives, including Jonathan Moulton, Eleni Kalyvus, Marshall Georges, Jim Purdy, and other representatives from the Imperial Entities.

17.    In furtherance of those discussions, IHI representatives made repeated representations as to the benefits of premium finance, the benefits of premium finance with IHI and the Imperial Entities, and how such would benefit Marrone with respect to estate taxation and income tax issues then relevant to the time period and financial position of Marrone. Between January 2008 and December 2008 said IHI representatives assured Marrone, and his representatives, that entering into the premium finance transaction with IHI and the Imperial Entities would be a) fair and honest, b) would provide the best possible estate tax advantage, c) would allow Marrone to receive the benefits of the policy maturity, and d) would be beneficial to Marrone's then-current income tax situation.

18.    Based thereon and having been convinced that financing the upcoming premiums made the most sense, and that Imperial Entities were in fact the best provider for said services, Marrone proceeded to enter into a series of transactions with the Imperial Entities, specifically IHI, IPF and PFS. Ultimately, on or around

- 6 -

1 December 18, 2008, Plaintiff executed a promissory note relating back to February 26,
2 2008, for the financing of the Policy premiums.  A true and correct copy of said
3 Promissory Note evidencing the financing arrangement is attached herewith as
4 **Exhibit A**.  On behalf of Defendants, IPF, was listed as the Lender, and counter-
5 signatory to the Note.

6       19.    As part of the inducement for Plaintiff to execute the Promissory Note,
7 said Note contained a two (2) year maturity date, the principal being due on April 26,
8 2010.  This date was agreed to by Plaintiff in that it allowed Plaintiff to achieve the
9 desired ends sought by financing the Policy premiums.  Moreover, two years was a
10 sufficient time for Marrone to repay the maximum principal amount contained in the
11 note, of $88,253.67.

12      20.    Simultaneous thereto, Plaintiff executed a document entitled
13 "Assignment of Life Insurance Policy as Collateral" wherein Plaintiff was advised by
14 IHI and its representatives that this document was in lieu of having a personal
15 guarantee by Marrone to ensure repayment of the loan.  Specifically, at the time of
16 execution of the agreement, Marrone was told that the document would assign those
17 portions of the death benefits from the policy, at the time of policy maturity, then
18 needed to repay any balance owing on the loan.  In other words and by example, if at
19 the time of maturity of the Policy there remained a balance to the Imperial Entities of
20 $75,000.00 inclusive of interest etcetera, then $75,000.00 of the $2.1MM death
21 benefits would serve to repay (collateralize) said amount.  Plaintiff understood this to
22 be in accordance with premium lender finance law at the time.  A true and correct
23 copy of the Assignment of Life Insurance Policy as Collateral is attached herewith as
24 **Exhibit B**.

25      21.    As set forth below, Plaintiff was not told that the entire policy proceeds
26 (in other words the complete surrender of ownership in the Policy and the $2.1MM
27 benefits therefrom) would serve as collateral to a then $88,000.00 loan.

28

- 7 -

1      22.  In hindsight, this was not the only matter that IHI and the related Imperial
2  Entities failed to disclose to Plaintiff.  On September 27, 2011 the Imperial Entities'
3  business operations were subject to a "raid" by the Federal Bureau of Investigation, as
4  a result of an investigation by the State of New Hampshire, among other states, as to
5  IHI's business practices, their methods of solicitation, and the actual motives behind
6  the financing programs offered by IHI and its related companies.  Said investigation
7  by both the FBI and the Securities Exchange Commission is ongoing currently, and
8  based on publicly available information, Plaintiff is advised of the following from the
9  United States Attorney's Office and other sources:

10      Imperial Holdings, Inc. (Imperial), a publicly traded specialty finance
11      corporation headquartered in Boca Raton, Florida, has entered into a Non-
12      Prosecution Agreement (NPA) with the United States Attorney's Office for the
13      District of New Hampshire to pay a multimillion dollar penalty to resolve fraud
14      allegations related to Imperial's involvement in making misrepresentations on
15      life insurance applications in connection with its premium finance business.. .

16      23.  According to the NPA, from December 2006 through January 2009, as
17  part of its premium finance business, certain Imperial employees, who were licensed
18  insurance agents, worked with external general agents and brokers, to obtain life
19  insurance policies on individuals over 65 years of age for which Imperial would offer
20  premium finance loans. These Imperial employees had direct contact with the
21  prospective insureds and worked with the insureds and external general agents and
22  brokers to complete life insurance applications for submission to various life
23  insurance companies.

24      24.  The United States Attorney's Office entered into the NPA with Imperial
25  based, in part, on Imperial's decision to terminate its premium finance business and
26  separate the employees who are known at this time to have been primarily involved in
27  the misconduct identified above, as well as, Plaintiff is informed and believes, further
28  conduct as set forth herein.  This includes certain individuals who participated in the

- 8 -

1   finance process of the Marrone Policy, not limited to Jonathan Moulton.  Plaintiff is
2   informed and believes and thereon alleges that an investigation into Jonathon Moulton
3   and other executives from the Imperial Entities is ongoing.

4          25.    As part of its illegal and wrongful business acts, Plaintiff is informed and
5   believes and thereon alleges that in some instances, Imperial employees who were
6   also licensed life insurance agents wrote the policies used as collateral for loans.  In
7   additional Plaintiff is further informed an believes that the Imperial Entities conspired
8   together to devise ways in which a) they could market and sell premium finance
9   programs to agents throughout the United States, b) and that in doing so they would
10  induce the insureds and to engage in finance programs with the Imperial Entities, and
11  c) so that IHI could and ultimately would receive the ownership of the financed
12  policies and the death benefits therefrom, as opposed to simply earning interest on the
13  repayments of their premium finance loans.

14         26.    In furtherance of their scheme, once IHI and its related entities devised a
15  means to foreclose on the policy loans, it would then have the option of maintaining
16  the premiums until the policy matured (the insured died), or it could liquidate the
17  insurance policy be selling it on the secondary market (the life settlement market), and
18  thus immediately profit from the sale of the policy.

19         27.    IHI and the Imperial Entities engaged the services of Defendant Bank of
20  Utah to assist in this scheme, by having Bank of Utah serve as the "institutional
21  trustee" for those policies IHI and its related entities undertook premium financing
22  for.  Plaintiff is informed and believes and thereon alleges that the IHI Defendants
23  engaged Defendant Bank of Utah for this purpose because Bank of Utah would follow
24  the instruction of IHI and the Imperial Entities without question, even if such required
25  violating insurance regulations in the State of Utah.

26         28.    Specifically in fact, Utah insurance laws exist that prohibits an insurance
27  premium finance company from obtaining an interest in an insured's policy, over and
28  above any and all amounts due based solely on the financing. See, e.g. Utah Cade

Annotated (U.C.A) 31A-21-104 (Insurable interest and consent, requires that an insurable interest exist not only on the effective date of the insurance but also at the time of the later procurement of an interest in the proceeds. Further, subsection U.C.A. 31A-21-104(2) {b} states that a "person may not knowingly procure, directly, by assignment or otherwise, an interest in the proceeds of an insurance policy unless that person has or expects to have an insurable interest in the subject of the insurance."

29. Such pattern of conduct was exactly what transpired here: prior to the transfer of the policy, subsequent default on the note (which never occurred here), or any other reason for which Marrone would be required to cease serving, or unable to serve, as trustee of the Marrone Trust, Bank of Utah substituted itself as the co- trustee for the Marrone Trust. Not only was this not explained to Marrone, but it was only done so that IHI, the Imperial Entities, by and thought Bank of Utah, could control and manipulate the policy as they saw fit, without the knowledge and or interference of Marrone. Plaintiff is informed and believes and thereon alleges from the inception of its financing of certain policies, including the Marrone Policy, the Imperial Entities and Bank of Utah intended to exercise control and dominion over the Policy for purposes of either collecting on the policy benefits at maturity, or otherwise capitalizing financially from their ownership of the Policy.

30. In light of the ongoing investigation by Federal Authorities, and the volume of Lincoln Financial Group policies involved with the IHI Defendants in this same manner, Plaintiff is informed and believes and thereon alleges that Defendant Lincoln was aware of, and in fact participated in the ongoing efforts of its co-Defendants. Specifically, by participating in the scheme, underwriters, agents, and other employees of Lincoln would benefit by placing more Lincoln policies than normally would have been placed at the time. The more Lincoln policies that are placed, the more Lincoln Financial Group profits as a result of the premiums earned in connection therewith, and more specifically, the more commissions are earned by Lincoln agents in doing so.

1    31.    In similar fashion to the now uncovered Imperial Entity scheme and plan,
2  in or around January 2009, approximately one month after the execution of **Exhibit A**,
3  IPF, on behalf of itself, IHI and the Imperial Entities sent Marrone notice that the
4  terms of the financing agreement were now "changing." Specifically, IPF advised
5  Marrone in said letter that the maturity date for the loan is now being advanced by one
6  entire year; and that the new maturity date of the premium finance loan is now August
7  27, 2009, as opposed to April 26, 2010. A true and correct copy of said letter is
8  attached herewith as **Exhibit C**.

9    32.    Indeed this caught Marrone by surprise. In response thereto, between
10  January 2009 and June or July 2009, Marrone began a series of discussions with IHI
11  and the Imperial Entities as to why this was the case, and how the note matured, but
12  more importantly, what were his options with respect to the Policy and the balance
13  owed on the Note. Given Marrone's then and current advanced age, Marrone cannot
14  recall all of the conversations he had and with whom at IHI or IPF he had said
15  conversations.

16    33.    Notwithstanding the foregoing, Plaintiff recalls conversations with IHI,
17  including Jonathan Moulton wherein Marrone was pressured that he should simply
18  abandon the Policy and surrender the Policy prior to the loan payoff date (now
19  advanced). The reason given for this unusual request and for the repeated pressure to
20  heed to the request, was that according to IHI there would soon be the passage of an
21  unfavorable US Treasury Department Ruling that would make the forgiveness of the
22  debt associated with the policy taxable to borrowers." Plaintiff was further advised
23  that if he just transferred the policy, it would be allowed to lapse, and thus Marrone
24  would have no further obligations to the Note, the Policy, or any other financial
25  obligations to any party herein.

26    34.    Plaintiff is informed and believes and thereon alleges that this
27  information was false, and that no such Treasury ruling was ever intended or
28  forthcoming. Instead, Plaintiff is informed and believe and thereon allege that IHI and

- 11 -

1  the Imperial Entities were using this tactic as leverage in an effort to have borrowers,
2  such as Plaintiff, surrender their polices early, thus facilitating Defendants scheme and
3  devise: to obtain borrowers policies and use them as assets for themselves.

4      35.    True to this form, after these ongoing conversations, on  or about July 23,
5  2009 Bank of Utah, acting in concert with IPF, on behalf of itself and the Imperial
6  Entities, sent Plaintiff a "thirty Day Maturity Notice" which contained a July 8, 2009
7  notice of the same character from IPF.  In said correspondence, a true and correct
8  copy of which is attached herewith as **Exhibit D**, Defendant Bank of Utah further
9  advised Plaintiff that there are no additional funds in the trust with which to pay the
10  premiums necessary to keep the Policy in force (funds that should have been provided
11  by the original terms of the Note executed in December 2008).   This pattern fits
12  exactly that later revealed by the ongoing investigation described herein and
13  throughout.

14      36.    After receipt of the letters, and the misrepresentations and fraudulent
15  information provided by Defendants, Marrone believed he was left with no option; he
16  was not told that he could seek a third party source of funding; he was not told he
17  could attempt to otherwise liquidate the asset himself; and he was not told that there
18  may be additional options by which the Policy might be saved.  In other words,
19  Plaintiff was not told the truth.  Thus on August 24, 2009, when Marrone received a
20  letter from IPF, on behalf of itself and the Imperial Entities, containing an "Agreement
21  to Voluntarily Relinquish Interest" he executed the same and surrendered himself a
22  victim to the scheme. A true and correct copy of the Agreement and cover letter is
23  attached herewith as **Exhibit E**.

24      37.    Based on the falsities and misrepresentations set forth herein and
25  throughout, Plaintiff complied with the further document execution requirements
26  provided by Defendants, and in doing so, effectively turned over a $2,100,000.00
27  asset for approximately $66,000.00 remaining on a promissory note.

28

38.     As further evidence that Marrone was indeed a victim to the scheme that is currently and still being investigated and uncovered by Federal Authorities, on or about October 29, 2010 Plaintiff received a letter from Defendant Lincoln, advising that a "third party" life settlement company was requesting information related to The Policy; meaning that Defendant IHI and the related Imperial Entities were in fact seeking to sell the Marrone Policy for their own benefit.  Thus, it is clear that IHI and the Imperial Entities intended to a) lend the bare minimum on the Policy in order to implement their scheme to exercise dominion and control over the Policy, b) IHI and the Imperial Entities did in fact gain control and dominion over the Policy, and c) IHI and the Imperial Entities ultimately attempted to monetize the Marrone Policy by selling it to a third party. A true and correct copy of the Lincoln Letter is attached herewith as **Exhibit F**.  Marrone, again being of significantly advanced age, was not aware of the meaning behind **Exhibit F**.

39.     Thereafter all communication with the various Defendants ceased, and Plaintiff was unaware as to the true nature of what had transpired.  It was not until on or around April 30, 2012 that the news of the FBI raid into the offices and business practices of IHI and the related Imperial Entities became public, and that upon learning the same, Plaintiff considered he might have been the victim of the scheme and plan set forth herein, and now known through the investigation to have transpired.

40.     On July 12, 2013 Veneice Williams Marrone passed away.  Thus in completion of its bad acts, IHI stands to receive the $2,100,000.00 death benefits as proceeds from its wrongful, illegal scheme.  Based thereon, Plaintiff is informed and believes and thereon alleges that IHI and Bank of Utah are currently undertaking efforts to complete the necessary actions to receive the proceeds from the Policy, and that in doing so, said Defendants continue to exercise dominion and control over the Policy.  In doing so, said Defendants have denied, and continue to deny Plaintiff's right to and in the Policy, including the right to receive the death benefits therefrom.

**COMPLAINT FOR DAMAGES**

## PLAINTIFF'S CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELEIF

### (Declaratory Relief as to the Rights and interests of the
### Parties in and to the Policy Against all Defendants)

41.    Plaintiff realleges and incorporates paragraphs 1 through 40 above by reference as though fully set forth herein.

42.    As set forth herein and throughout, there is now an actual controversy of a justiciable nature as to whether the Policy is owned by the Marrone Trust, whether Tony Marrone and /or the Bank of Utah is the Trustee of the Trust, and what are the rights and interests of IHI and the Imperial Entities, and the rights of Plaintiff, in and to the Policy.

43.    Plaintiff is entitled to a judicial declaration, in view of the circumstances surrounding the Policy as to the rights, title and interests of the Plaintiffs and the Defendants in and to the Policy.

44.    Based thereon the Plaintiff respectfully requests the entry of an Order by this Court declaring that:

        a.    The Marrone Trust is the owner, and Marrone is the beneficiary of the Policy;

        b.    IHI's only rights are to receive repayment of any amounts paid by IHI and the Imperial Defendants to Lincoln or to the Plaintiff in regard to the financing of the policy and that the IHI and Imperial Defendants must provide the Plaintiff with a proper demand for repayment of its obligations, and that beyond said sums, the Imperial Defendants have no other interest in or to the Policy;

        c.    Tony Marrone is the individual Trustee for the Trust;

        d.    Bank of Utah is not a Trustee of the Trust;

        e.    Lincoln is bound to honor the terms and conditions of the Policy as to the Plaintiff;

- 14 -

1         f.    No other Defendant herein has any right title or interest in or to the

2  Policy.

3

4        **SECOND CLAIM FOR RELEIF**

5        **(For Injunction Against All Defendants)**

6      45.    Plaintiff realleges and incorporates paragraphs 1 through 44 above by

7  reference as though fully set forth herein.

8      46.    Based upon the controversy as between the parties as hereinabove

9  alleged, Plaintiff seeks a temporary restraining order and preliminary injunction,

10 restraining and enjoining Defendants, and each of them, from selling, transferring,

11 assigning, or other attempting to exert dominion and control over the Policy, and or

12 proceeds from the Policy, during the pendency of this action.

13     47.    Should a restraining order not issue, Plaintiff will suffer irreparable harm

14 should the Policy and or the proceeds from the Policy be transferred, sold or otherwise

15 assigned by Defendants, in that any potential third party acquiring could assert an

16 ownership interest in and to the Policy, and thus subject Plaintiff to a loss of its

17 interests in the Policy.  Moreover, if in fact Defendants, and any of them, receive the

18 proceeds from the Policy, specifically the $2.1MM death benefit, Defendants could

19 easily conceal, expend, transfer or otherwise misappropriate said funds, thus causing a

20 pecuniary loss to Plaintiff.

21     48.    Plaintiff is entitled to such injunctive relief as Plaintiff does not have an

22 adequate remedy at law, in that this controversy involved title to personal property,

23 which is unique and cannot be replaced given the fact that Veneice Williams Marrone

24 has passed away.  Specifically, in light of Veneice's death, the Policy at issue herein

25 cannot be reissued by another carrier, or replaced by a policy of similar character and

26 value.

27 ///

28 ///

- 15 -

**COMPLAINT FOR DAMAGES**

1

2

### THIRD CLAIM FOR RELIEF

### (Fraud Against Defendants IHI, IPF, ILS, and PLS)

3    49.    Plaintiff realleges and incorporates paragraphs 1 through 48 above by
4  reference as though fully set forth herein.

5    50.    As hereinabove alleged, IPF's conduct in inducing Plaintiff to enter into
6  the initial Promissory Note, Assignment of Policy as Collateral Agreement, and
7  ultimately the Voluntary Transfer of the Policy Agreement, was based upon material
8  misrepresentations of fact and law, in that throughout the time said Defendants were
9  negotiating the Agreements and thereafter, said Defendants knew that they were
10 engaged in illegal criminal conduct of the nature set forth herein and throughout.  In
11 furtherance of Defendants conduct,  Plaintiff is further informed an believes that the
12 Imperial Entities conspired together to devise ways in which a) they could market and
13 sell premium finance programs to agents throughout the United States, b) and that in
14 doing so they would induce the insureds and to engage in finance programs with the
15 Imperial Entities, and c) so that IHI could and ultimately would receive the ownership
16 of the financed policies and the death benefits therefrom, as opposed to simply earning
17 interest on the repayments of their premium finance loans.

18    51.    As set forth in detail above in or around January to July 2009, after
19 completing the financing transactions, the Imperial Entities, by and through their
20 authorized representative including but not limited to Jonathan Moulton, made certain
21 false representations to Plaintiff about the terms of the financial arrangements between
22 Plaintiff and said Defendants, the terms of the Promissory Note, and the options that
23 remained with respect to the Policy.

24    52.    In or around January 2009, approximately one month after the execution
25 of the Promissory Note, IPF, on behalf of itself, IHI and the Imperial Entities sent
26 Marrone notice that the terms of the financing agreement were now "changing."
27 Specifically, IPF advised Marrone in said letter that the maturity date for the loan is

28

1 | now being <u>advanced by one entire year</u>; and that the new maturity date of the
2 | premium finance loan is now August 27, 2009, as opposed to April 26, 2010.

3       53.     Thereafter, Plaintiff recalls conversations with IHI, including Jonathan
4 | Moulton wherein Marrone was pressured that he should simply abandon the Policy
5 | and surrender the Policy prior to the loan payoff date (now advanced). The reason
6 | given for this unusual request and for the repeated pressure to heed to the request, was
7 | that according to IHI there would soon be the passage of an unfavorable US Treasury
8 | Department Ruling that would make the forgiveness of the debt associated with the
9 | policy taxable to borrowers." Plaintiff was further advised that if he just transferred
10 | the policy, it would be allowed to lapse, and thus Marrone would have no further
11 | obligations to the Note, the Policy, or any other financial obligations to any party
12 | herein. This information is entirely false.

13       54.     Plaintiff was not told that he could seek a third party source of funding;
14 | he was not told he could attempt to otherwise liquidate the asset himself; and he was
15 | not told that there may be additional options by which the Policy might be saved.

16       55.     In making the fraudulent misrepresentations or omissions of material fact
17 | to the Plaintiff, said Defendants intended Plaintiff to rely on the same, and in fact the
18 | Plaintiff did rely on the misrepresentations and omissions of material fact set forth
19 | herein and throughout. As a result, in or around August 2009 Plaintiff executed the
20 | Voluntary Relinquish of Policy Agreement attached herewith, which turned over the
21 | Policy and its benefits to Defendants. In fact and in truth, the Imperial Entities
22 | conspired together to devise ways in which a) they could market and sell premium
23 | finance programs to agents throughout the United States, b) and that in doing so they
24 | would induce the insureds and to engage in finance programs with the Imperial
25 | Entities, and c) so that IHI could and ultimately would receive the ownership of the
26 | financed policies and the death benefits therefrom, as opposed to simply earning
27 | interest on the repayments of their premium finance loans.

28

**COMPLAINT FOR DAMAGES**

56.    Said Defendants fraudulent conduct is further demonstrated by their intent to lend the bare minimum on the Policy in order to implement their scheme to exercise dominion and control over the Policy, whereupon subsequently IHI and the Imperial Entities did in fact gain control and dominion over the Policy, and where after IHI and the Imperial Entities ultimately attempted to monetize the Marrone Policy by selling it to a third party.

57.    As a direct and proximate cause of IPF's fraud as hereinabove alleged, Plaintiff has been damaged in an amount to be determinate at the time of the trial of this matter, but in excess of the jurisdictional limits of this court, but in an amount no less than $2,100,000.00.

58.    Said Defendants conduct as hereinabove alleged was done, intentionally, willfully, maliciously and with reckless disregard to the rights of Plaintiff so as to entitle Plaintiff to punitive damages as against these Defendants, and each of them, in an amount to be determined at the time of trial of this matter.

## FOURTH CLAIM FOR RELIEF
### (Unfair Business Practices Violation of Cal. Bus. & Prof. Code §17200, et seq. Against all Defendants)

59.    Plaintiff realleges and incorporates herein by reference paragraphs 1 through 58 inclusive, as though the same were fully set forth herein.

60.    Defendants and each of their acts and practices as described herein and throughout constitute unlawful, fraudulent, and unfair business practices in violation of California's Business and Professions Code, Sections 17200, et seq., in that (1) the justification of Defendants' conduct is outweighed by the gravity of the consequences to Plaintiff; (2) Defendants' conduct is illegal, immoral, unethical, oppressive, unscrupulous, unconscionable or substantially injurious to Plaintiff; and (3) the uniform concerted conduct of the Defendants, and each of them, has a tendency to deceive Plaintiff.

61.     As set forth above, said Defendants unlawful, unfair, and fraudulent business acts and practices included but were not limited to attempting to and ultimately succeeding in exercising control and dominion of the Marrone Policy, with the intent to either monetize said Policy on the secondary insurance market, or to collect the death benefits from the Policy upon the Policy's maturity.  Further Defendants concerted actions constituted unlawful business acts and practices pursuant to California Business &Professions Code § 17200, et seq., and other similar state unfair competition and unlawful business practices statutes, in that said Defendants have asserted ownership of the Policy and have prevented Plaintiff from obtaining clear and unencumbered ownership of the Policy and the benefits therein. In doing so said Defendants are asserting interests in and to the Policy that are precluded by law.

62.     Pursuant to California Business and Professions Code §§ 17200 and 17203, Plaintiff seeks relief in the form of damages, injunctive relief and for recovery of reasonable attorney fees and costs, all as afforded by statute.

## FIFTH CLAIM FOR RELIEF

### (Elder Abuse by Marrone in his Individual Capacity
### against Defendants IHI, IPF, ILS, and PLS )

63.     Plaintiff realleges and incorporates paragraphs 1 through 62 above by reference as though fully set forth herein.

64.     As set forth herein, the conduct of said Defendants in attempting to obtain dominion and control over the Policy, to the detriment of Marrone, the lawful beneficiary of the Marrone Trust, and thus the proceeds from the Policy, under California Law constitutes Elder Abuse as that term is defined in California Civil Code Sections 1575, and 3345 and California Welfare and Institutions Code Section 1561010.30 ("Financial Abuse").

65.   Said Defendants, having interacted with Marrone,  knew that their conduct was directed to Marrone, who by definition under California's Civil Code and Welfare and Institutions Code is a "senior citizen" being over 70 years of age, and further knew that their conduct caused and will cause and is intended to cause a substantial loss of personal property that is to be used for family care and maintenance of the Plaintiff and his family, and that said Defendant's conduct was done for a wrongful purpose or with the intent to defraud Plaintiff, or both.  Tony Marrone will be 89 years old in September 2013.

66.   Defendants' conduct, as hereinabove and throughout alleged, was intended to and did cause Plaintiff to suffer substantial physical, emotional and economic damages, and Defendants knew or should have known that their conduct is and was likely to be harmful to Plaintiff.

67.   As a proximate result of the Defendants' wrongful conduct, Plaintiff has sustained and will sustain substantial economic lasses and other general and specific damages all an amount to be determined according to proof.

68.   As a further proximate result of Defendants' wrongful conduct, Plaintiff has sustained great emotional pain and mental suffering, all in an amount to be determined according to proof.

69.   The actions taken by said Defendants, set forth herein and throughout, were in all respects reckless, malicious, willful and oppressive, and manifested either disregard or contempt for the rights of Tony Marrone.

70.   Defendants were fully cognizant of the position of trust in which they stood.

71.   Based upon Defendants' conduct as alleged hereon and throughout, Plaintiff is entitled to an award of punitive and exemplary damages as well as attorneys' fees, in an amount according to proof at the time of trial.

72.   As the subject transactions involved senior citizens, Plaintiff is further entitled to treble damages and penalties pursuant to California Civil Code section

1 | 3345 because Defendants knew or should have known that their conduct was directed
2 | to one or more senior citizens, specifically to Tony Marrone.

3

4

### **PRAYER FOR RELIEF**

5

6 | WHEREFORE, Plaintiff prays for relief as follows:

7

### **ON THE FIRST CLAIM FOR RELIEF**

8

### **(For Declaratory Relief)**

9 | 1. Entry of an Order by this Court declaring that:

10 |     a.    The Marrone Trust is the owner, and Marrone is the beneficiary of the
11 | Policy

12 |     b.    IHI's only rights are to receive repayment of any amounts paid by IHI
13 | and the Imperial Defendants to Lincoln or to the Plaintiff in regard to the financing of
14 | the policy and that the IHI and Imperial Defendants must provide the Plaintiff with a
15 | proper demand for repayment of its obligations, and that beyond said sums, the
16 | Imperial Defendants have no other interest in or to the Policy;

17 |     c.    Tony Marrone is the individual Trustee for the Trust;

18 |     d.    Bank of Utah is not a Trustee of the Trust;

19 |     e.    Lincoln is bound to honor the terms and conditions of the Policy as to the
20 | Plaintiff;

21 |     f.    No other Defendant herein has any right title or interest in or to the
22 | Policy.

23 | 2. For reasonable attorney fees and costs of suit;

24 | 3. For interest as allowed by law;

25 | 4. For such other relief as deemed appropriate by this Court.

26 | / / /

27 | / / /

28 | / / /

- 21 -

**ON THE SECOND CLAIM FOR RELIEF**

**(For Injunction Against All Defendants)**

1. For a temporary restraining order, preliminary injunction, and permanent injunction restraining and enjoining Defendants, and each of them, from selling, transferring, assigning, or otherwise attempting to exert dominion and control over the Policy or the proceeds from the policy, during the pendency of this action.

2. For reasonable attorney fees and costs of suit;

3. For interest as allowed by law;

4. For such other relief as deemed appropriate by this Court.

**ON THE THIRD CLAIM FOR RELIEF**

**(For Fraud Against the Imperial Entity Defendants)**

1. For damages according to proof;

2. For punitive damages according to proof;

3. For reasonable attorney fees and costs of suit;

4. For interest as allowed by law;

5. For such other relief as deemed appropriate by this Court.

**ON THE FOURTH CLAIM FOR RELIEF**

**(For Unfair Business Practices (B&P 17200 et Seq.) Against all Defendants)**

1. For damages according to proof;

2. For declaratory and injunctive relief as allowed by statute;

3. For reasonable attorney fees and costs of suit allowed by statute;

4. For interest as allowed by law;

5. For such other relief as deemed appropriate by this Court.

/ / /

/ / /

/ / /

## ON THE FIFTH CLAIM FOR RELIEF

### (For Elder Abuse Against the Imperial Entities)

1. For damages according to proof;
2. For punitive damages according to proof;
3. For treble damages allowed by statute;
4. For reasonable attorney fees and costs of suit allowed by statute;
5. For interest as allowed by law;
6. For such other relief as deemed appropriate by this Court.

DATED: August 15, 2013                    BEITCHMAN & ZEKIAN, P.C.


By: _____
    David P. Beitchman
    Attorneys for Plaintiff

**COMPLAINT FOR DAMAGES**

# EXHIBIT A

# PROMISSORY NOTE

| Maximum Principal | Loan Date | Maturity | Loan No. | Find Verselie Rate | Account |
|---|---|---|---|---|---|
| $88,253.67 | February 26, 2008 | April 26, 2010 | 2008-54 | | Servicing |

References in the shaded area are for Lender's use only and do not limit the applicability of this document to any particular loan or item. Any items above containing "****" or left blank have been omitted due to text length limitations.

Borrower: The Marrone Family 2007-1 Irrevocable Life Insurance Trust-2
200 East South Temple Suite 210
Salt Lake City UT 84111

Lender: Imperial Premium Finance, LLC
701 Park of Commerce Blvd.
Suite 301
Boca Raton, FL 33487

Maximum Principal Amount: $88,253.67, Initial Loan Amount Advanced: $66,737.60, Initial Rate: 12.46%, Date of Note: February 26, 2008

PROMISE TO PAY. The Marrone Family 2007-1 Irrevocable Life Insurance Trust-2 ("Borrower") promises to pay to the order of Imperial Premium Finance, LLC ("Lender") in lawful money of the United States of America, all principal, together with accrued interest and all other charges, owed under the terms of this Promissory Note as hereinafter set forth and the Loan Agreement (as defined below). The maximum principal that may be advanced to Borrower shall be $88,253.67, or such lesser amount as determined in accordance with that certain Loan Application and Agreement (the "Loan Agreement") of even date herewith between Borrower and Lender and Lender shall have no obligation to make any advance in excess of that amount. Any advance shall be made under, and in accordance with, the Loan Agreement. In the event the unpaid balance of this Promissory Note ever is greater than the maximum principal advance, Borrower agrees to repay immediately the excess upon Lender's written demand. Capitalized terms used but not defined herein shall have the meanings assigned thereto in the Loan Agreement.

PAYMENT. The principal amount of this Promissory Note, together with all accrued but unpaid interest and all other charges, shall be due and payable in full in one lump sum on April 26, 2010, or if earlier, either: (a) one (1) Business Day after payment of any proceeds of the Life Insurance Policy to or for the benefit of the Borrower; or (b) if the Life Insurance Policy is rescinded for any reason, one (1) Business Day after the return of any Life Insurance Policy premium. All payments shall be applied in the following order: (i) to any collection costs Lender may have incurred in procuring Borrower's performance on this Promissory Note; (ii) to any fees due under the Loan Agreement; (iii) to the accrued interest which has accrued on the balance of the Promissory Note, and (iv) to the outstanding principal balance of the Promissory Note. All interest under the Promissory Note shall be calculated on the basis of a 360-day year for the actual number of days elapsed in an interest period (actual/360 method). Determination of a rate of interest by the Lender shall, in the absence of manifest error, be conclusive and binding upon the Borrower. Borrower will pay Lender at Lender's address shown above or at such other place as Lender may designate in writing. All payments shall be made in lawful money of the United States to Lender at the address set forth above or at such other place as the Lender under this Promissory Note may designate in writing ("Payment Address").

INTEREST RATE. The Interest Rate on this Promissory Note shall be set (or initially set) at 12.46% per annum on a simple interest basis. The interest rate on this Promissory Note shall be a floating rate. If a fixed rate, it shall be fixed at the Interest Rate set forth in the preceding sentence. If a floating or variable rate, it shall be reset periodically as follows. If the interest rate on this Promissory Note is set at variable/floating and not fixed, the Interest Rate shall initially be set forth in the first sentence of this paragraph and shall be adjusted thereafter on the first day of each month during the term of this Promissory

MI1.W_26606602.7

Note. Each date on which the interest rate could vary or change is called a "Change Date." Beginning with the first Change Date, the Interest Rate will be based on an Index plus the Spread. The "Index" is the LIBOR (one month) on the Change Date which is publicly announced in the "Money Rates" section of The Wall Street Journal, Eastern Edition, or such other similar publication, as is reasonably determined by the Lender. If the Index is no longer available, the Lender will choose a new index which is based upon comparable information. If the Change Date is not a Business Day, the rate as announced on the next Business Day shall be used.

On each Change Date, the Lender will calculate the new interest rate by adding 5% basis points (the "Spread") to the Index. Subject to the limits set forth herein, this amount will be the new interest rate until the next Change Date. The interest rate the Borrower is required to pay under this Promissory Note will not be greater than 16% or less than 12.46%. Any new interest rate will become effective on each Change Date.

NOTICE: Under no circumstances will the effective rate of interest on this Promissory Note be more than the maximum rate allowed by applicable law.

PREPAYMENT.   Borrower agrees that all loan fees, including the Origination Fee and the Yield Maintenance Premium, and other prepaid finance charges are earned fully as of the date of this Promissory Note and will not be subject to refund upon early payment (whether voluntary or as a result of default), except (i) in the case of death of the insured prior to maturity, the Yield Maintenance Premium will be waived, or (ii) as otherwise required by law. Borrower agrees not to send Lender payments marked "paid in full", "without recourse", or similar language. If Borrower sends such a payment, Lender may accept it without losing any of Lender's rights under this Promissory Note, and Borrower will remain obligated to pay any further amount owed to Lender. All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to the Payment Address. No privilege is reserved by Borrower to prepay any principal due hereunder and under the Loan Agreement prior to the Maturity Date, except that the Borrower may after giving five (5) days' prior written notice to Lender, prepay in full, but not in part, all principal and interest to and including the date on which payment is made, along with all sums, amounts, advances, or charges due under the Loan Agreement, this Promissory Note or the other Financing Documents, upon the payment of the Yield Maintenance Premium.

LATE CHARGE. Borrower shall pay to Lender a "late charge" in an amount equal to three percent (3%) of any amounts that are not paid within five (5) days after the due date thereof to cover the extra expense involved in handling delinquent payments. Lender's collection of a late charge however shall not be deemed a waiver by Lender of any of its rights under this Promissory Note, or any other agreement between Borrower and Lender.

SECURITY.   This Promissory Note is entitled to the benefit of, among other things, that certain Assignment Of Life Insurance Policy As Collateral ("Collateral Assignment") made by Borrower in favor of Portfolio Financial Servicing Company, as collateral agent for the Lender (the "Collateral Agent"), pursuant to which the Collateral Agent is granted a first priority security interest in the Life Policy (as such term is defined in the Collateral Assignment). This Promissory Note shall be subject to the terms and conditions set forth in such Collateral Assignment, the Loan Agreement, and the other Financing Documents.

INTEREST AFTER DEFAULT. Upon default, all amounts due under this Promissory Note shall bear interest from the date of acceleration or maturity at the interest rate set forth in this Promissory Note (as it may be adjusted from time to time) plus 2% per annum.

DEFAULT. Each of the following shall constitute an event of default ("Event of Default") under this Promissory Note:

2

Payment Default. Borrower fails to make any payment within three (3) Business Days after the same becomes due and payable under this Promissory Note, the Loan Agreement, or any other Financing Document.

Other Default. Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Promissory Note, the Loan Agreement or in any of the other Financing Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

False Statements. Any warranty, representation or statement made or furnished to Lender by Borrower, the Insured or on Borrower's behalf under this Promissory Note, the Loan Agreement or any other Financing Document is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

Related Agreements. The Life Insurance Policy, Promissory Note, Loan Agreement, Security Agreement or any other Financing Document ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason; the Borrower becomes a revocable trust, contests the validity or enforceability of any Financing Document or denies that it has any further liability under any Financing Document to which it is a party, or cancels or terminates, or attempts to cancel or terminate, the Life Insurance Policy, or the insurer contests the Life Insurance Policy based on the Borrower lacking an insurable interest in the life of the Insured.

Indebtedness, Creditor or Forfeiture Proceedings. Any attachment of any of Borrower's accounts, attachment, lien, levy, additional encumbrance or additional security interest being placed upon any of the Collateral, or any commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any Collateral, and which is not discharged in full within one (1) day of the placement thereof. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

Insolvency or Default of Borrower. The Borrower is (i) dissolved, liquidated or terminated, (ii) is unable to pay its debts as they mature, (iii) makes an assignment for the benefit of creditors, (iv) is bankrupt or insolvent, (v) seeks appointment of, or becomes the subject of an order appointing a trustee, conservator, liquidator or receiver as to all or part of its assets; (vi) commences, approves or consents to, or is the debtor in, any case or proceeding under any bankruptcy, reorganization or similar law, and in the case of an involuntary case or proceeding, such case or proceeding is not dismissed thirty (30) days following its commencement; (vii) is the subject of an order for relief in an involuntary case under federal bankruptcy law; (viii) the Borrower defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's property or Borrower's ability to repay this Promissory Note or perform Borrower's Obligations under this Promissory Note, the Loan Agreement or any of other Financing Documents, or (x) Borrower violates any Law.

Insolvency or Default of Insured or Guarantor. (i) The Insured or any Guarantor makes an assignment for the benefit of creditors; (ii) The Insured or any Guarantor is adjudicated a bankrupt or insolvent; (iii) The Insured or any Guarantor seeks appointment of, or is the subject of an order appointing, a trustee, conservator, or receiver as to all or part of his assets; (iv) The Insured or any Guarantor commences, approves or consents to, or is the debtor in, any case or proceeding under any bankruptcy or similar law and, in the case of an involuntary case or proceeding, such case or proceeding is not dismissed thirty (30) days following its commencement; (v) The Insured or any

Guarantor is the subject of an order for relief in an involuntary case under federal bankruptcy law; (vi) Borrower defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's property or Borrower's ability to repay the Obligations; or (vi) any Guarantor defaults under the terms of the Personal Guaranty.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the indebtedness under this Promissory Note or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any guaranty of the indebtedness evidenced by this Promissory Note; in the event of a death of a Guarantor, Lender, at its option, may, but shall not be required to, permit the Guarantor's estate to assume unconditionally the obligations arising under the Personal Guaranty in a manner satisfactory to Lender, and, in doing so, cure any Event of Default.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of the Obligations is materially impaired.

**Cure Provision.** Other than as set forth in the preceding clauses of this Section, failure by the Borrower or insured, as applicable, to perform in any material respect any of the obligations under this Promissory Note, Loan Agreement, Security Agreement or any other Financing Document, to which either is a party if such failure is not remedied on or prior to the fifteenth (15th) day after written notice of such failure is given to the Borrower or the insured, respectively, by the Lender.

**LENDER'S RIGHTS.** It is stipulated and agreed in the event one or more installments are not paid when the same falls due, or in default of any covenant herein, then the entire balance of the indebtedness shall, at once or at any time thereafter, at the option of the payee of this Promissory Note, become due, payable and collectible. Demand, protest, and notice of demand, protest, and nonpayment are hereby waived by the undersigned.

**ATTORNEYS' FEES; EXPENSES.** Lender may hire or pay someone else to help collect this Promissory Note if Borrower does not pay. Borrower will pay Lender the amount of these costs and expenses, which includes, subject to any limits under applicable law, Lender's reasonable attorneys' fees and Lender's legal expenses whether or not there is a lawsuit, including reasonable attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), and appeals. If not prohibited by applicable law, Borrower also will pay any court costs, in addition to all other sums provided by law.

**JURY WAIVER.** LENDER AND BORROWER HEREBY WAIVE THE RIGHT TO ANY JURY TRIAL IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM BROUGHT BY EITHER LENDER OR BORROWER AGAINST THE OTHER.

**GOVERNING LAW.** THIS PROMISSORY NOTE WILL BE GOVERNED BY THE LAWS OF THE STATE OF UTAH WITHOUT REGARD TO ITS CONFLICTS OF LAW PROVISIONS. THIS PROMISSORY NOTE HAS BEEN ACCEPTED BY LENDER IN THE STATE OF UTAH. BORROWER AGREES TO BE SUBJECT TO THE EXCLUSIVE JURISDICTION OF SALT LAKE CITY, UT CONCERNING ANY DISPUTES ARISING OUT OF OR RELATING TO THIS PROMISSORY NOTE AND HEREBY SUBMITS TO SUCH JURISDICTION.

**REQUESTS FOR SPECIAL SERVICES.** In general, there are no borrower-paid fees associated with the routine servicing of a loan. Borrower, however, may occasionally find it necessary to request services for which there is a charge. The services that fall outside of routine servicing include, without limitation, providing the following documents upon request: duplicate year-end statements, copies of loan documents or periodic statements, payment histories, and replacement coupon books. Borrower agrees to pay the fees imposed by Lender in connection with providing the requested services, as in effect from time to time. Borrower also agrees to pay facsimile or other fees imposed by Lender if these services are requested on a

4

expedited basis. All such fees shall be fully earned and non-refundable and shall be paid upon Lender's demand (provided, that Lender, in its discretion, may add the fees to the principal indebtedness due, and accrue interest thereon, and the same shall be due, if not sooner demanded by Lender upon the maturity of the indebtedness without further demand). The fees shall not be deemed to be interest or charges for the use of money.

SUCCESSOR INTERESTS. The terms of this Promissory Note shall be binding upon Borrower, and upon Borrower's heirs, personal representative, successors and assigns, and shall inure to the benefit of Lender and its successors and assigns.

GENERAL PROVISIONS. If any part of this Promissory Note cannot be enforced, this fact will not affect the rest of this Promissory Note. Borrower does not agree or intend to pay, and Lender does not agree or intend to contract for, charge, collect, take, reserve or receive (collectively referred to herein as charge or collect), any amount in the nature of interest or in the nature of a fee for this loan, which would in any way or event (including demand prepayment, or acceleration) cause Lender to charge or collect more for this loan than the maximum Lender would be permitted to charge or collect by federal law or the law of the State of Utah (as applicable). Any such excess interest or unauthorized fee shall, instead of anything stated to the contrary, be applied first to reduce the principal balance of the amounts due hereunder to the extent of such excess or, at the option of the Borrower, shall be returned to the Borrower. Lender may delay or forgo enforcing any of its rights or remedies under this Promissory Note without losing them. Borrower and any other person who signs, guarantees or endorses this Promissory Note, to the extent allowed by law, waive presentment, demand for payment, and notice of dishonor. This Promissory Note is the Promissory Note referred to in, and is entitled to the benefits of, the Loan Agreement and the other Financing Documents.

PRIOR TO SIGNING THIS PROMISSORY NOTE BORROWER HAS READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS PROMISSORY NOTE, INCLUDING THE VARIABLE INTEREST RATE PROVISIONS. BORROWER AGREES TO THE TERMS OF THE PROMISSORY NOTE

It is expressly understood and agreed by any recipient hereof that in no event shall Bank of Utah, as trustee of the Borrower, in its individual capacity have any liability for the representations, warranties, covenants, agreements or other obligations of the Borrower hereunder or under any schedule, exhibit, appendix or other document in connection with this Promissory Note, as to all of which recourse shall be had solely to the assets of the Borrower, and under no circumstances shall Bank of Utah as trustee of the Borrower be personally liable for the payment of any indebtedness or expenses of the Borrower or be liable for the breach or failure of any obligation, representation, warranty or covenant made or undertaken by the Borrower under this Promissory Note or under any schedule, exhibit, appendix or other document in connection with this Promissory Note.

**BORROWER:**

**The Marrone Family 2007-1 Irrevocable Life Insurance Trust-2**

By: Bank of Utah, Co-Trustee

Signature: _____

Name: _____ R. Dah

Title: _____ Vice President

Before me, the undersigned, personally appeared Nancy M. Dahl, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument, and he or she acknowledged to me that he or she is a _____ Vice President of Bank of Utah, which executed the foregoing instrument as Co-Trustee of the The Marrone Family 2007-1 Irrevocable Life Insurance Trust-2, and that he or she was authorized by general signing authority resolutions adopted by Bank of Utah to execute documents such as this instrument.

GIVEN under my hand and official seal of office this the _22_ day of _Dec_ , 200X.

CHARLEE WADSWORTH
Notary Public
State of Utah
My Comm. Expires Nov. 19, 2011
200 E South Temple 7th 2163 SLC UT 84111

The Marrone Family 2007-1 Irrevocable Life Insurance Trust-2

By: _____

Name: Tony Marrone

Title: Co-Trustee

Before me, the undersigned, personally appeared Tony Marrone, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument, and he or she acknowledged to me that he or she is a Co-Trustee of the The Marrone Family 2007-1 Irrevocable Life Insurance Trust-2, and that he or she was authorized to execute documents such as this instrument.

GIVEN under my hand and official seal of office this the _18_ day of _December_ , 200X.



LINDA RATHY
Commission # 1709640
Notary Public - California
Los Angeles County
My Comm. expires Jul 15, 2010

6

**BORROWER:**

**The Marrone Family 2007-1 Irrevocable Life Insurance Trust-2**

**By: Bank of Utah, Co-Trustee**

Signature: _____
Name: _____
Title: _____

Before me, the undersigned, personally appeared _____ personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument, and he or she acknowledged to me that he or she is a _____ of Bank of Utah, which executed the foregoing instrument as Co-Trustee of the The Marrone Family 2007-1 Irrevocable Life Insurance Trust-2; and that he or she was authorized by general signing authority resolutions adopted by Bank of Utah to execute documents such as this instrument.

GIVEN under my hand and official seal of office this ____ day of _____, _____.

_____
Notary Public

**The Marrone Family 2007-1 Irrevocable Life Insurance Trust-2**

By: _____
Name: Tony Marrone
Title: Co-Trustee

Before me, the undersigned, personally appeared Tony Marrone, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument, and he or she acknowledged to me that he or she is a Co-Trustee of the The Marrone Family 2007-1 Irrevocable Life Insurance Trust-2, and that he or she was authorized to execute documents such as this instrument.

GIVEN under my hand and official seal of office this 18 day of December, _____.

_____
Notary Public

**EXHIBIT B**

February 26, 2008

INSURER: Jefferson Pilot Life Insurance Company

## ASSIGNMENT OF LIFE INSURANCE POLICY AS COLLATERAL

This ASSIGNMENT OF LIFE INSURANCE POLICY AS COLLATERAL (this "Assignment") is dated as of February 26, 2008, and is made in favor of Portfolio Financial Servicing Company, a Delaware corporation, in its capacity as collateral agent (the "Collateral Agent") by The Marrone Family 2007-1 Irrevocable Life Insurance Trust-2, a Utah life insurance trust (together with its successors and permitted assigns, the "Assignor").

WHEREAS, pursuant to a Loan Application and Agreement between Imperial Premium Finance, LLC, a Florida limited liability company (including any application and assignees thereof, the "Lender") and Assignor dated February 26, 2008 (the "Loan Agreement"), the Lender has made an initial loan in the amount of $66,737.00 (the "Loan") to the Assignor as evidenced by a Promissory Note dated February 26, 2008 (as amended, supplemented or modified from time to time, the "Promissory Note").

WHEREAS, the Assignor is the sole owner of the Life Policy (as defined below);

WHEREAS, as a condition precedent to the Lender's obligations under the Promissory Note and Loan Agreement to make the Loan to the Assignor, the Lender requires the Assignor to execute and deliver this Assignment to the Collateral Agent.

NOW, THEREFORE, in consideration of the premises and the mutual covenant hereinafter contained, and for other good and valuable consideration, the adequacy and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

1.   DEFINITIONS.  Capitalized terms used herein and not otherwise defined have the respective meanings specified in the Loan Agreement.

2.   COLLATERAL ASSIGNMENT.  For value received, the Assignor hereby assigns, transfers, pledges and grants all of the Assignor's claims, options, privileges, rights, title and interest in, to and under the life insurance policy described below to the Collateral Agent:

Policy No.: JF-5565795

Issued by: Jefferson Pilot Life Insurance Company ("Insurer")

Insured: Veneice Williams Marrone ("Insured")

and any and all applications, riders, endorsements, supplements, amendments, renewals and all other documents that modify or otherwise affect the terms and conditions of such policy issued in connection therewith, and any and all proceeds thereof (said policy, contracts, other documents and proceeds are hereinafter collectively referred to as the "Life Policy"), subject to all the terms and conditions of this Assignment. This Assignment includes, without limitation, assignment of the following rights:

(a) the sole right to collect from the Insurer the net proceeds of the Life Policy payable upon the death of the Insured or maturity of the Life Policy;

(b) the sole right to surrender, in whole or in part, the Life Policy and receive the surrender value thereof at any time provided by the terms of such Life Policy and at such other times as the Insurer may allow, and the sole right to exercise any and all other rights permitted by the terms of the Life Policy or allowed by the Insurer and to receive all benefits and advantages derived therefrom;

(c) the sole right to obtain any loans or advances on the Life Policy at any time, either from the Insurer or from other persons or entities, and to pledge or assign the Life Policy as security for such loans or advances;

(d) the sole right to further assign the Collateral Agent's rights under the Life Policy to any person and for any purpose;

(e) the sole right to collect and receive all distributions, credited earnings, any shares of surplus, dividend deposits or additions to said other proceeds of the Life Policy now or hereafter made or apportioned thereto, and to exercise any and all rights and options contained in the Life Policy with respect thereto and to determine the amount of premiums or other amount paid with respect to any feature of the Life Policy permitting such a right or option;

(f) the sole right to request that the Insurer amend the Life Policy;

(g) the sole right to any and all contract rights, arising from or relating to the Life Policy, and any and all payment rights, and the other rights listed above, existing with respect thereto;

(h) the sole right to exercise any and all amendment, voting, or notification rights or privileges to the extent created or endowed by the Life Policy and the right to apply for and maintain waiver of premiums or any version of the Life Policy;

(i) the sole right to return the Life Policy for cancellation or redemption; and

(j) the sole right to do or cause to be done all things necessary, proper or advisable to maintain the Life Policy in force.

2

Notwithstanding the foregoing, the right to elect any optional mode of settlement permitted by the Life Policy or allowed by the insurer is reserved and excluded from this Assignment and does not pass by virtue hereof, but the reservation of this right shall in no way impair the right of the Collateral Agent to surrender the Life Policy consistently with all its incidents or impair any other right of the Collateral Agent hereunder, and any election of a mode of settlement shall be made subject to this Assignment and to the rights of the Collateral Agent hereunder.

It is expressly agreed that the following specific rights may not be exercised while this Assignment is in effect, except with the consent of the Assignor and Collateral Agent:

    (a)    The right to change the death benefit option;

    (b)    The right to change the face amount; or

    (c)    The right to add or delete any riders or other policy benefits, which are permitted by the terms of the Life Policy.

It is further agreed that the Collateral Agent will not exercise either the right to surrender the Life Policy or request a partial withdrawal, or otherwise act under this Assignment until there has been a default in any of the Obligations (as defined below), and the Collateral Agent has mailed, by first class mail to the Assignor to the address set forth in Section 10(f), notice of intention to exercise such right, and three days have elapsed after the date such notice has been mailed by the Collateral Agent.

3.    **OBLIGATIONS SECURED**. This Assignment is made, and the Life Policy is to be held, as collateral security for all present and future obligations of the Assignor to the Lender under the Loan Agreement and Promissory Note (including, without limitation, all rights of the Lender to receive the outstanding principal amount, accrued interest and other fees and charges due thereunder) and all liabilities, obligations, covenants, duties, and indebtedness owing by the Assignor to the Collateral Agent under this Assignment (all of which obligations of the Assignor to the Lender/Collateral Agent secured or to become secured hereby are herein called the "Obligations"). For purposes of this Assignment, the term "Obligations" shall also include, without limitation, interest accruing during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding.

4.    **BENEFITS PAYMENT DIRECTIVE**. The Assignor hereby authorizes and directs the Insurer to pay any and all periodic payments and other amounts, including, without limitation, death benefits, due or that become due and payable under or on account of the Life Policy either to the Collateral Agent or as the Collateral Agent directs in writing; provided, however, that nothing in this paragraph entitles the Collateral Agent to retain more than the amount of the Obligations.

5.    **REPRESENTATIONS AND WARRANTIES OF THE ASSIGNOR**. The Assignor hereby represents and warrants as follows:

named therein under the Uniform Commercial Code or comparable law of any jurisdiction, and any restriction on the use, voting, transfer, receipt of income or other exercise of any attributes of ownership);

(vii) to the Assignor's actual knowledge, the Life Policy is not subject to any right of rescission, set-off, recoupment, counterclaim or defense, whether arising out of the transactions concerning such Life Policy between the Lender and the Assignor, the Insured or otherwise, and no such right has been asserted;

(viii) there is no default, breach or violation under the Life Policy, and no event has occurred that, with notice and/or the expiration of any grace or cure period, would constitute a default, breach or violation under the Life Policy;

(ix) the Assignor is not subject to any Internal Revenue Service, state or local governmental authority review, notice of deficiency, tax assessment, audit notice or equivalent review regarding the tax benefits or tax payable in connection with the purchase, holding or transfer of the Life Policy;

(x) there are no governmental orders and no proceedings or investigations pending or, to the actual knowledge of the Assignor, threatened, before any governmental authority asserting the invalidity of the Life Policy, seeking the payment under the Life Policy or making any governmental order that could reasonably be expected to adversely affect the validity or enforceability of the Life Policy, or reduce the death benefit or surrender value thereunder;

(xi) no proceedings in bankruptcy are pending or to the Assignor's knowledge threatened against the Assignor, its trustee or the Insured (and no grounds exist for such proceedings) and none of the Assignor's, its trustee's or the Insured's property is subject to any assignment for the benefit of creditors; and

(xii) the Assignor has delivered or caused to be delivered to the Collateral Agent true and correct copies of all necessary or appropriate consents executed by the appropriate persons (including, without limitation, the Insured) authorizing the Lender and each of its representatives to review the Life Policy, all applications, riders, endorsements, supplements, amendments and all other documents that modify or otherwise affect the terms and conditions of the Life Policy, and all medical, psychological and health and/or life expectancy related records regarding the Insured.

6.     ACKNOWLEDGEMENTS AND AGREEMENTS. The Assignor hereby acknowledges and agrees as follows:

(a) any balance of sums received hereunder from the Insurer remaining after payment of the then-existing Obligations, matured or unmatured, shall be paid in full by the Collateral Agent to the persons or entities entitled thereto under the terms of the Life Policy as if this Assignment had not been executed;

(b) the Insurer is hereby authorized and directed to recognize the Collateral Agent's claims to rights hereunder without investigating the reason for any action taken by the Collateral Agent, or the validity or the amount of the Obligations or the existence of any default therein, or the giving of any notice hereunder, under applicable law or otherwise, or the application to be made by the Collateral Agent of any amounts to be paid to the Collateral Agent; the sole signature of the Collateral Agent shall be sufficient for the exercise of any rights under the Life Policy assigned hereby and the sole receipt by the Collateral Agent of any sums shall be a full discharge and release therefor to the Insurer; wire transfers or checks for all or any part of the sums payable under the Life Policy and assigned herein shall be paid to the Collateral Agent or its designee if, when, and in such amounts as may be requested by the Collateral Agent;

(c) neither the Lender nor the Collateral Agent shall be under any obligation to pay from their own funds any premium, or the principal of or interest on loans or advances on the Life Policy, if any, whether or not obtained by the Lender or the Collateral Agent, or any other charges on the Life Policy, but such amounts so paid by the Lender or Collateral Agent from their own funds shall become a part of the Obligations hereby secured, shall be due and payable immediately, and shall accrue interest at rate set forth in the Promissory Note;

(d) the exercise of any right, option, privilege or power given to the Collateral Agent under this Assignment shall be at the option of the Collateral Agent, and the Collateral Agent may exercise any such right, option, privilege or power without notice to, or consent by, or affecting the liability of, or releasing any interest hereby assigned by the Assignor;

(e) the Assignor shall do or cause to be done all things necessary to preserve and keep in full force and effect the Assignor's existence; the Assignor shall not distribute, sell, transfer, lease or otherwise dispose of (in one transaction or in a series of transactions) all or substantially all of its assets (in each case, whether now owned or hereafter acquired), or terminate, liquidate or dissolve while the Obligations remain outstanding;

(f) the Assignor shall deliver to the Collateral Agent copies of any and all reports, financial statements, notices, illustrations, projections and other information received from the Insurer in any way related to the Life Policy, and the Assignor shall cooperate with the Collateral Agent in obtaining any additional information from the Insurer that the Collateral

Agent may reasonably request from time to time in respect of the Life Policy;

(g)     the Assignor shall not surrender, cancel or otherwise terminate the Life Policy or allow the Life Policy to lapse or terminate and the Assignor shall, at its sole cost and expense, preserve and keep in full force the Life Policy until the Obligations have been satisfied in full pursuant to the terms of the Promissory Note;

(h)     the Assignor shall not take any action in contravention of the Collateral Agent's security interest in the Life Policy, or grant or permit to exist any Lien on the Life Policy other than the interests granted to the Lender and Collateral Agent under this Assignment, the Promissory Note, the Loan Agreement and the other Financing Documents;

(i)     the Assignor shall not, directly or indirectly, by operation of law or otherwise, merge, consolidate, or otherwise combine with any person or entity, unless this Assignment and all obligations hereunder are assumed by such person or entity pursuant to such merger, consolidation or other combination;

(j)     the Assignor shall comply with and enforce all provisions of its Trust Documents;

(k)     Following an Event of Default (as defined in the Loan Agreement), the Assignor shall accept written instructions from the Collateral Agent regarding the disposition of the Life Policy and any other collateral or proceeds covered thereby, including instructions to assign ownership of the Life Policy to the Lender or any third party engaged to dispose of the collateral, or to dispose of the collateral in a commercially reasonable fashion or as otherwise directed in writing by the Collateral Agent; and

(l)     the Assignor shall not take any action under the Life Policy without the written consent of the Lender or Collateral Agent, and agrees to take such actions with respect to the Life Policy as the Lender or Collateral Agent may reasonably request in writing.

7.     TERMINATION. Upon the final and irrevocable payment and satisfaction in full of all of the Obligations, this Assignment and the security interests created hereunder shall automatically terminate.

8.     LIMITED POWER OF ATTORNEY; STANDARD OF CARE.

(a)     The Assignor hereby irrevocably constitutes and appoints the Collateral Agent and any officer or agent thereof, with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power and authority in the place and stead of such Assignor and in the name of such Assignor or in its own name, from time to time at the Collateral Agent's

7

discretion, for the limited purpose of carrying out the terms of this Assignment, to take any and all appropriate action and to execute and deliver any and all documents and instruments that the Collateral Agent may deem necessary or desirable to accomplish the purpose of this Assignment and to effectuate any right assigned to the Collateral Agent under this Assignment (including, without limitation, the right to transfer or direct the transfer of the Life Policy or the proceeds thereof to the Collateral Agent upon the sole signature of the Collateral Agent) or Lender under the Promissory Note, as the case may be; provided, however, that nothing in this Assignment shall obligate the Collateral Agent to protect the interests of the Assignor or any other person or entity in or under the Life Policy.

(b)     The Assignor hereby ratifies, to the extent permitted by law, all that any said attorney shall lawfully do or cause to be done by virtue hereof. The power of attorney granted pursuant to this Assignment, being coupled with an interest, shall be irrevocable until the Obligations are indefeasibly paid in full (in the case of payment obligations) and otherwise satisfied and discharged.

(c)     The powers conferred on the Collateral Agent pursuant to this Section 8 are solely to protect the Collateral Agent's interests in the Life Policy and shall not impose any duty upon the Collateral Agent to exercise any such powers. For the avoidance of doubt, nothing herein shall obligate the Collateral Agent to take any action with respect to the Life Policy, including without limitation, selling, transferring or disposing of the Life Policy, and the Collateral Agent shall have the right to do or cause to be done all things necessary, proper or advisable to maintain the Life Policy in full force in accordance with its terms.

(d)     The Collateral Agent's sole duty with respect to the Life Policy shall be to use reasonable care in the custody and preservation of any documents or instruments in the Collateral Agent's possession evidencing such Life Policy in the same manner as the Collateral Agent deals with similar property for its own account. The Collateral Agent shall not be responsible to the Assignor except for the Collateral Agent's own gross negligence or willful misconduct.

(e)     The Collateral Agent shall not be responsible for filing any financing or continuation statements or recording any documents or instruments in any public office at any time or times or otherwise perfecting or maintaining the perfection of any security interest in the Collateral. The Collateral Agent shall not be liable or responsible for any loss or diminution in the value of any of the Collateral, by reason of the act or omission of any carrier, forwarding agency or other agent or bailee selected by the Collateral Agent in good faith. The Collateral Agent shall not be responsible for the existence, genuineness or value of any of the Collateral

or for the validity, perfection, priority or enforceability of the lien in any of the Collateral, whether impaired by operation of law or by reason of any action or omission to act on its part hereunder, except to the extent such action or omission constitutes gross negligence, bad faith or willful misconduct on the part of the Collateral Agent, for the validity or sufficiency of the Collateral or any agreement or assignment contained therein or for the payment of taxes, charges, assessments or liens upon the Collateral or otherwise as to the maintenance of the Collateral.

9.    NO WAIVER. Any forbearance or failure or delay by the Collateral Agent in exercising any right, power or remedy hereunder shall not be deemed to be a waiver of such right, power or remedy, and any single or partial exercise of any right, power or remedy shall not preclude the further exercise thereof. The Collateral Agent may take or release other security, may release any party primarily or secondarily liable for any of the Obligations, may grant extensions, renewals or indulgences with respect to the Obligations, or may apply to the Obligations in such order as the Collateral Agent shall determine the proceeds of the Life Policy hereby assigned or any amount received on account of the Life Policy by the exercise of any right permitted under this Assignment, without resorting or regard to other security or any guaranty. No waiver of any provision hereof shall be effective unless it shall be in writing and signed by the Collateral Agent.

10.    MISCELLANEOUS.

(a)    Counterparts. This Assignment may be executed in any number of counterparts, each of which shall constitute an original and together shall constitute one and the same instrument.

(b)    Assignment. This Assignment shall be binding upon the Assignor and its successors and assigns and shall inure to the benefit of the Collateral Agent and its successors and assigns.

(c)    Arbitration. Any claims, questions or controversies arising under or related to in any manner whatsoever this Assignment or the transactions contemplated hereunder including, but not limited to, any claims by the Assignor, the Insured, or the Insured's estate or subrogees (each, a "Assignor Party") against the Collateral Agent, Lender or any other party with a participation in the loan evidenced under the Promissory Note (each, an "Interested Party", notwithstanding the fact such parties are not signatories hereto) (a "Dispute") shall be submitted to arbitration conducted before the American Arbitration Association (the "AAA"). Any Assignor Party or any Interested Party is hereby authorized to invoke this arbitration provision, and any judgment with respect to any award rendered pursuant to this arbitration provision may be entered in any court of competent jurisdiction. Such arbitration will be conducted under the rules of the AAA and the laws of the State of Utah and will be conducted in Salt Lake City, UT. Each Assignor Party understands that claims submitted to arbitration are not heard by a jury and are not subject to the

rules governing the courts. Each Assignor Party further agrees that no claim may be brought as a class action, and that no Assignor Party has the right to act, nor shall they attempt to act, as a class representative or participate as a member of a class of claimants with respect to any claim related to or arising out of this Assignment. To the extent that this arbitration provision is held unenforceable, the Assignor Parties (a) irrevocably submit to the exclusive jurisdiction of any federal or state court sitting in Salt Lake City, UT in respect of any action or proceeding arising under or related to in any manner whatsoever this Assignment, (b) agree that this Assignment and the transactions contemplated hereunder shall in all respects be governed by and construed in accordance with the laws of the State of Utah (without reference to conflict of laws provisions); provided, however, that the rights, protections and immunities of the Collateral Agent shall be governed under the laws of the State of Utah; and (c) HEREBY WAIVE THE RIGHT SUCH PARTY MAY HAVE TO A TRIAL BY JURY ON ANY CLAIM, COUNTERCLAIM, SETOFF, DEMAND, ACTION OR CAUSE OF ACTION (I) ARISING OUT OF OR IN ANY WAY RELATED TO THIS ASSIGNMENT OR (II) IN ANY WAY IN CONNECTION WITH OR PERTAINING OR RELATED TO OR INCIDENTAL TO ANY DEALINGS OF THE PARTIES TO THIS ASSIGNMENT IN CONNECTION WITH THIS ASSIGNMENT OR THE EXERCISE OF ANY PARTY'S RIGHTS AND REMEDIES UNDER THIS ASSIGNMENT OR OTHERWISE, OR THE CONDUCT OR THE RELATIONSHIP OF THE PARTIES HERETO, IN ALL OF THE FOREGOING CASES WHETHER NOW EXISTING OR HEREAFTER ARISING AND WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE. The Assignor Parties hereby agree and acknowledge that this provision is intended to encompass any Dispute between any Assignor Party and any Interested Party. The parties hereby expressly agree, and each Interested Party in receipt of this Assignment acknowledges that the arbitration provision in this Section 10(c) shall not apply to the trustee of the Assignor in respect of its rights, duties, protections and immunities under the Trust Documents.

(d)  Inconvenient Forum. The Assignor hereby irrevocably waives, to the fullest extent that it may legally do so, the defense of an inconvenient forum to the maintenance of any action or proceeding arising out of or related to this Assignment or any other Financing Documents. The Assignor further agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

(e)  Disclaimer. THE ASSIGNOR ACKNOWLEDGES AND AGREES THAT THE COLLATERAL AGENT HAS NOT AND WILL NOT PROVIDE ANY ADVICE OR RECOMMENDATIONS IN CONNECTION WITH THIS ASSIGNMENT, INCLUDING, WITHOUT LIMITATION, ADVICE OR RECOMMENDATIONS RELATING TO

ESTATE OR FINANCIAL PLANNING, TAXES OR ACCOUNTING OR LEGAL MATTERS. THE ASSIGNOR HAS HAD THE OPPORTUNITY TO BE REPRESENTED BY ITS OWN COMPETENT COUNSEL IN CONNECTION WITH THE NEGOTIATION AND EXECUTION OF THIS ASSIGNMENT. THE UNDERSIGNED ACKNOWLEDGES THAT BEFORE SIGNING THIS ASSIGNMENT, THE ASSIGNOR HAS READ THIS ASSIGNMENT IN ITS ENTIRETY AND RECEIVED A LEGIBLE, COMPLETELY FILLED-IN COPY OF THIS ASSIGNMENT.

(f)    Notices. All demands, notices and communications hereunder will be in writing and will be deemed to have been duly given if personally delivered at, mailed by certified mail, return receipt requested, mailed by a nationally recognized overnight courier or sent via facsimile or email, to each applicable party at the address specified below or, as to any of such parties, at such other address or facsimile number as will be designated by such party in a written notice to the other party:

If to the Assignor:

    The Marrone Family 2007-1 Irrevocable Life Insurance Trust-2
    c/o Bank of Utah,
    200 East South Temple Suite 210
    Salt Lake City, UT 84111
    Telephone:
    Facsimile:

    The Marrone Family 2007-1 Irrevocable Life Insurance Trust-2
    c/o Tony Marrone,
    224 S Bentley Ave
    Los Angeles, CA 90049

If to the Lender:

    Imperial Premium Finance, LLC
    701 Park of Commerce Blvd, Ste 301
    Boca Raton, FL 33487
    Facsimile: 1.561.995.4201

If to the Collateral Agent:

    Portfolio Financial Servicing Company
    2121 SW Broadway, Suite 200
    Portland, OR 97201
    Attention:
    Telephone: 503-228-1245
    Facsimile:

(g) Severability. In the event any one or more of the provisions contained in this Assignment shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision hereof, and this Assignment shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein.

(h) Trustee Recourse. It is expressly understood and agreed by the parties hereto that (i) this Assignment is entered into by Bank of Utah and Tony Marrone, not individually or personally, but solely as co-trustees of the Assignor in the exercise of the powers and authority conferred and vested in Bank of Utah and Tony Marrone by the Assignor and (ii) in no event shall Bank of Utah and Tony Marrone, in its individual capacity, have any liability for the representations, warranties, covenants, agreement or other obligations of the Assignor hereunder, as to all of which recourse shall be had solely to the assets of the Assignor.

*[Signature Page Follows]*

12.

IN WITNESS WHEREOF, the undersigned Assignor has executed this Assignment in favor of the Lender as of the date first written above.

ASSIGNOR:

The Marrone Family 2007-1 Irrevocable Life Insurance Trust-2

By: **Bank of Utah, Co-Trustee**

Name: Nancy M. Dahl
Title: Vice President

STATE OF **Utah** )
                                    ) :
COUNTY OF **Salt Lake** )

Sworn to (or affirmed) and subscribed before me this 22 day of _____, 20__
by _____ Nancy M. Dahl _____, the _____ Vice President _____ (title) of Bank of
Utah, who is personally known to me or who produced _____ as identification.

Notary Public

**Sharlee Hackworth**

(Print, type, or stamp commissioned
Name of Notary Public)

My Commission Expires: _____

**IN WITNESS WHEREOF,** the undersigned Assignor has executed this Assignment in favor of the Lender as of the date first written above.

ASSIGNOR:

The Marrone Family 2007-1 Irrevocable Life Insurance Trust-2

By: _____

    Name:  Tony Marrone
    Title:   CO-TRUSTEE

STATE OF California )
                   ) :
COUNTY OF Los Angeles )

Sworn to (or affirmed) and subscribed before me this 13 day of December by **Tony Marrone**, who is personally known to me or who produced Drivers License as identification.

_____
Notary Public

Linda Ratliff
(Print, type, or stamp commissioned
Name of Notary Public)

My Commission Expires: July 15, 2011

LINDA RATLIFF
Commission # 1759680
Notary Public - California
Los Angeles County
My Comm. Expires Jul 15, 2011

14

IN WITNESS WHEREOF, the undersigned Lender has accepted and acknowledged this Assignment as of the date first written above.

LENDER:

**Imperial Premium Finance, LLC**

By: _____
   Name: _____
   Title: _____

IN WITNESS WHEREOF, the undersigned Collateral Agent has accepted and acknowledged this Assignment as of the date first written above.

COLLATERAL AGENT:

**Portfolio Financial Servicing Company**

By:   **Portfolio Financial Servicing Company, solely as Collateral Agent**

   Name: _____
   Title: _____

15

Consent and Acknowledgment

The undersigned hereby:

(a) acknowledges its receipt of the attached Assignment of Life Insurance Policy as Collateral (the "Assignment") with respect to the Life Policy (as defined in said Assignment);

(b) confirms that it has recorded in its books and records, with respect to the Life Policy, the Assignment of such Life Policy to the Collateral Agent (as defined in the Assignment) in a manner sufficient to cause the Assignment to the Collateral Agent to be recognized in its books and records;

(c) confirms that it has not previously received notice of any other assignment of or security interest in the Life Policy except for _____ securing the Loan Agreement (as defined in the Assignment) and Promissory Note (as defined in the Assignment); and

(d) agrees to pay all amounts/death benefits due under the Life Policy directly to the Collateral Agent.

Jefferson Pilot Life Insurance Company is not a party to the Assignment and assumes no responsibility for the sufficiency or validity of the Assignment.

Jefferson Pilot Life Insurance Company

By: _____
Signature

_____
Print Name

Title:

Date:

Assignee Life Policy:

Policy Owner: _____
Policy Number: _____

# EXHIBIT C



Veneice Williams Marrone
224 South Bentley Avenue
Los Angeles, CA 90049

Tony Marrone
224 South Bentley Avenue
Los Angeles, CA 90049

Bank of Utah
200 E. South Temple, Ste. 210
Salt Lake City, UT 84111

January 13, 2009

Dear Mrs. Marrone et al,

As you know, Imperial Premium Finance, LLC ("Imperial") will enter into a premium finance transaction with the Marrone Family 2007-1 Irrevocable Life Insurance Trust-2 (the "Trust"). I am sending you this letter to inform you of a change in the loan effective as of the original date of the loan.

The Issue Date of the policy is June 27, 2007. As a result, the Maturity Date of the Loan is adjusted from April 26, 2010 to August 27, 2009.

Best regards,

Mary L. Marbach, Esquire
Senior Transactional Counsel

701 Park of Commerce Boulevard, Suite 301
Boca Raton, FL 33487

888.36.IMPRL (364.6775)
561.995.4201 Fax

www.imprl.com

# EXHIBIT D



200 E. South Temple, Suite 210, Salt Lake City, UT 84111 • (801) 924-3690

Mr. Tony Marrone, as Beneficiary of
The Marrone Family 2007-1 Irrevocable Life Insurance Trust-2
224 S. Bentley Ave.
Los Angeles, CA 90049

July 23, 2009

RE:  The Marrone Family 2007-1 Irrevocable Life Insurance Trust-2(the "Trust")

Dear Mr. Marrone:

Enclosed please find the maturity notice received from Imperial Premium Finance, LLC ("Imperial"), the lender that financed the premium payments for Venecie Williams Marrone Polan #JF5565793 (the "Policy Loan") owned by the Trust.

The Trust does not have the assets available to repay the Policy Loan at this time. Therefore, there are several options available to you at this point.

Imperial may be willing to refinance the loan and lend additional funds to the Trust. Any such refinance would result in additional indebtedness to the Trust, and will require that you sign certain documents to complete the additional advance.

If you do not wish to have the Trust borrow further funds, you may provide the necessary funds to the Trust to pay the premiums to keep the Policy in force and to pay off the loan to Imperial.

As another option, the Trust, on your direction, may investigate a sale of the Policy by contacting reputable licensed third-party life settlement brokers to solicit bids. Please note that no assurances can be given that the policy may ever be sold or, if sold, how much may be realized.

If you do not direct the Trust to refinance the loan, and if the loan is not paid off by its maturity date, whether by you or with the proceeds of a sale, Imperial will have a right to foreclose on the policy.

We must notify Imperial of the course of action decided upon within the next thirty (30) calendar days. If we do not hear from you in writing by that time, we will work with Imperial to turn the policy over to them and bring a conclusion to the currently outstanding loan.

Sincerely,

Bank of Utah, as Trustee

By: _____

Name: Arge Feotis

Experience. Service.



## THIRTY DAY MATURITY NOTICE

July 23, 2009

Tony Marrone
224 S Bentley Ave
Los Angeles, CA 90049

Bank of Utah
200 East South Temple, Ste. 210
Salt Lake City, UT 84111

Re: The Marrone Family 2007-1 Irrevocable Life Insurance Trust-2

Ladies and Gentlemen:

On February 26, 2008, Imperial Premium Finance, LLC ("Imperial") entered into a loan agreement with the The Marrone Family 2007-1 Irrevocable Life Insurance Trust-2 ("Trust") whereby Imperial lent funds to the Trust to make premium payments on Jefferson Pilot Life Insurance Company Policy Number JF-5565795 ("Policy"). The loan was evidenced by several transaction documents, including a Promissory Note ("Note") and an Assignment of Life Insurance Policy as Collateral ("Collateral Assignment"), a copy of each attached hereto.

By way of letter dated July 8, 2009 we notified your office that the Note will become due on August 27, 2009. We are hereby providing your office with an additional notice of the impending maturity of the Note. Please contact the Servicing Department at Imperial Premium Finance at (888) 364-6775 should you wish to discuss your options as the loan term comes to an end.

Sincerely,

Marshall Georges
Director of Servicing

701 Park of Commerce Boulevard, Suite 301
Boca Raton, FL 33487

888.36.IMPRL (364.6775)
561.995.4201 Fax

www.impri.com

# EXHIBIT E


IMPERIAL
PREMIUM FINANCE, LLC

August 24, 2009

Veneice Marrone
224 South Bentley Avenue
Los Angeles, CA 90049

Tony Marrone
224 South Bentley Avenue
Los Angeles, CA 90049

Bank of Utah
Trust Services
200 East South Temple, Ste. 210
Salt Lake City, UT 84111

RE:  The Marrone Family 2007-1 Irrevocable Life Insurance Trust-2

Dear Ladies and Gentlemen:

Please find enclosed the Agreement to Voluntarily Relinquish Interest for The Marrone
Family 2007-1 irrevocable Life Insurance Trust-2. Please execute and return the
enclosed agreement as soon as possible in order to complete this transaction. Once
signed please forward the executed document to the Serving Department at Imperial
Premium Finance, 701 Park of Commerce Boulevard, Suite 301, Boca Raton, Florida
33487. Please note that since Mr. Marrone serves as a Co-Trustee as well as a
Beneficiary he will need to sign in two separate places on this agreement.

Sincerely,

Marshall Georges
Director of Servicing

701 Park of Commerce Boulevard, Suite 301
Boca Raton, FL 33487

888.36.IMPRL (364.6775)
561.999.4201 Fax

www.impri.com

## AGREEMENT TO VOLUNTARILY RELINQUISH INTEREST

This Agreement to Voluntarily Relinquish Interest ("Agreement") is entered into as of August 24, 2009 (the "Effective Date") by and between Venice Marrone (the "Trust"), Tony Marrone (the "Beneficiary(ies)"), Tony Marrone and Bank of Utah, Co-Trustee[Co-Trustees] (collectively, the "Trustee") of The Marrone Family 2007-1 Irrevocable Life Insurance Trust-2 (the "Trust") and Imperial Premium Finance, LLC, a Florida limited liability company, together with its successors and/or assigns and with a principal address at 701 Park of Commerce Blvd., Ste. 301, Boca Raton, FL 33487 (the "Lender") (individually a "Party" and collectively the "Parties"). All capitalized terms not defined herein shall have the meaning ascribed in the Loan Application & Agreement.

WHEREAS, Trust and Lender entered into that certain Loan Application & Agreement and that certain Promissory Note, dated as of February 26, 2008 (collectively, the "Loan Agreement"), as well as related documents (the "Loan Documents"), whereby Lender agreed to provide financing for the premium payments for Jefferson Pilot Policy # JF-5565795 insuring the life of the Insured (the "Policy").

WHEREAS, the Insured, Trust and Beneficiary(ies) have offered to irrevocably surrender, transfer, convey and assign absolutely all right, title, interest, and benefit in the Policy to the Lender in satisfaction in full of all the obligations due and owing to Lender under the Loan Documents;

WHEREAS, the Trustee, Insured and Beneficiary(ies) each understand that in connection with the obligations of the Trust under the Loan Documents, the Trust, Insured or Beneficiary(ies) had the option to satisfy the obligations under the Loan Agreement by: (1) paying off the loan from a source of their choice and continuing to own the Policy; or (2) selling the Policy to an independent third party. However, the Trustee, Insured and Beneficiary(ies) instead have elected to surrender all right, title, interest and benefit in the Policy to the Lender in full satisfaction of the obligations due under the Loan Documents.

WHEREAS, Lender is willing to accept ownership of the Policy in exchange for a release of the Trust's obligation to pay the amounts due under the Loan Documents or any other party's obligation to pay pursuant to any related guaranty as further set forth in the terms and conditions herein ;

NOW, THEREFORE, in consideration of the foregoing, the Parties agree as follows:

1.   The Insured, the Beneficiary(ies) and the Trustee represent and warrant to the Lender that:

   (i)   all representations made in the Loan Documents and signed by the respective Parties remain true, complete and correct;

   (ii)  neither the Trust, Insured nor Beneficiary(ies) have received any notice from any other party of any inaccurate statement or misrepresentation, or violation of a term or condition, contained in the application made by the Insured for the Policy or any violation of any term, condition or provision of the Policy, including without limitation, any notice of a rescission or cancellation of the Policy, or a lapse of the Policy; and

   (iii) there is no decree, judgment, order, litigation at law or in equity, arbitration, proceeding or proceeding before or by any commission, agency or other administrative or regulatory body or authority pending, or to the knowledge of the Trust, Insured or Beneficiary(ies) threatened, to which the Trust or the Trustee is a party or to which the Policy is subject or which could have an adverse effect on the Policy, and there is no basis for any other claim, litigation or proceeding;

   (iv)  there is no investigation by any commission, agency or other administrative or regulatory body or authority pending, or to the knowledge of the Trust, Insured or Beneficiary(ies) threatened, which is related to the Policy, nor is there any basis for any such investigation.

2.   In consideration of the foregoing, the Insured and Beneficiary(ies) further represent and warrant to Lender the following:

   (a)  the Insured and Beneficiary(ies) are competent and have the full legal capacity to perform the relinquishment contemplated herein;

   (b)  the Insured and Beneficiary(ies) had the opportunity to consult with and obtain advice and assistance from legal, financial, insurance and tax professionals, and to be represented by counsel prior to and in the execution of this Agreement; and

   (c)  the Insured and Beneficiary(ies) have entered into this Agreement freely and voluntarily and without coercion, duress or undue influence.

3.   Following execution of this Agreement, the Trustee shall execute such documents, including a change of ownership form, as may be necessary to convey legal and beneficial ownership of the Policy to the Lender or its designee and deliver such documents to the Lender promptly upon request. Notwithstanding the foregoing, the Trustee and the Lender agree that, as a condition to the effectiveness of this Agreement, the Trustee agrees to hold record, but not beneficial, title to the Policy until Lender notifies the Trustee in writing as to transfer of record ownership. During that time period, in the Lender's sole discretion, the Policy shall either be offered for sale, assigned or held on behalf of the Lender by the Trust as record owner, and as directed by Lender in writing. Other than being the record owner, the Trustee(s) shall not exercise any incidences of ownership over the Policy absent the express written consent of the

Lender and shall continue to hold the Policy free and clear of any lien or encumbrance. Within three (3) business days of the receipt of a written request from the Lender, the Trust agrees to execute any and all necessary documents required to secure the Lender's interest in the Policy, to be held in Trust until such time as Lender directs.

4.    While the Insured and the Beneficiary(ies) hereby agree to relinquish to the Trust all interest in the Trust and the Policy in exchange for a release of any financial obligation they may have had in relation to the Loan Amount and Loan Documents, the Insured and Beneficiary(ies) understand all other obligations (i.e., representations and warranties and indemnities for any breach thereof) under the Loan Documents of the Insured, Beneficiary(ies) and Trust remain in full force and effect.

5.    The Insured and the Beneficiary(ies) understand and acknowledge that, as a result of each's execution of this Agreement, each of the Insured and Beneficiary (ies) are relinquishing any and all right and claim to any proceeds that could be derived from or through the Policy, regardless of the source, including, but not limited to, from the sale, assignment or holding of the Policy or from proceeds arising from a death benefit from the Policy, if any.

6.    In addition, the Insured and the Beneficiary(ies), individually and collectively, release and covenant not to sue or bring any legal action against the Lender or any affiliates and agree to not raise any defenses with regard to any actions taken by the Lender or any affiliates as are permitted hereunder, including, but not limited to, a release of claim to any proceeds related to the Policy from whatever source, again including, but not limited, from the sale, assignment or holding of the Policy or from proceeds arising from a death benefit from the Policy, if any.

7.    The Insured and the Beneficiary(ies) have disclosed or caused to be disclosed to Lender all health and medical information requested by Lender about the Insured, and the Insured and Beneficiaries have not altered, changed or withheld any health and medical information requested by Lender about the Insured or failed to disclose the name of any doctor, physician, hospital or other health care provider or facility that has any health and medical information requested by Lender about the Insured.

8.    The Insured and the Beneficiary(ies) agree to continue to cooperate with Lender and execute all documents requested in connection with securing the Lender's interest in the Policy, including but not limited to: (i) the Insured shall continue to provide all updated medical information when and as requested; and (ii) the Insured and the Beneficiary(ies) shall execute all documents relating to the sale of the Policy within three (3) business days of the receipt of a written request for execution from Lender.

9.    In addition, the Insured, the Trust and the Beneficiary(ies) further agree to waive any and all applicable notice or timeframe requirements with respect to the relinquishment or any actions taken by the Lender hereunder.

10.    The Insured, the Beneficiary(ies) and the Trust understand and acknowledge that a failure to perform by the Insured, the Beneficiary(ies) or the Trust or any party hereunder shall be a breach of this Agreement pursuant to which they agree to consent to judgment and acknowledge that the Lender shall be permitted to pursue any and all legal and equitable remedies under this Agreement and the underlying Loan Documents.

11.    This Agreement shall be construed and governed in accordance with the laws of the State of Florida, without regard to conflict of laws principles. The Insured (s), the Beneficiary (ies) and the Trust agree that the Circuit Court of the Fifteenth Judicial Circuit in and for Palm Beach County, Florida shall have exclusive jurisdiction to hear and determine any claims or disputes between the parties arising out of or related to this Agreement, unless federal jurisdiction is available, in which case the Southern District of Florida, West Palm Beach Division, shall have exclusive jurisdiction to determine any claims or disputes arising out of or related to this Agreement. The Insured (s), the Beneficiary (ies) and the Trust expressly submit and consent in advance to such jurisdiction in any action or suit commenced in such court, and each party hereby waives any objection that it may have based upon lack of personal jurisdiction, improper venue or *forum non conveniens*. IN THE EVENT OF ANY LITIGATION PROCEEDINGS AND TO THE EXTENT PERMITTED BY LAW, EACH OF THE PARTIES HERETO KNOWINGLY AND WILLINGLY WAIVES AND SURRENDERS SUCH PARTY'S RIGHT TO TRIAL BY JURY AND AGREES THAT SUCH LITIGATION SHALL BE TRIED TO A JUDGE SITTING ALONE AS THE TRIER OF BOTH FACT AND LAW, IN A BENCH TRIAL, WITHOUT A JURY.

IN WITNESS WHEREOF, the parties have executed this Agreement effective as of the date specified above.

Tony Marrone, Co-Trustee

By: _____

Name: _____

Title: _____


Bank of Utah, Co-Trustee

By: _____

Name: _____

Title: _____


Venice Marrone

By: _____

Name: _____

Tony Marrone

By

Name     Tony Marrone

Imperial Premium Finance, LLC

By

Name

Title

# EXHIBIT F



The Lincoln National Life Insurance
Company
100 N. Greene Street
P.O. Box 21008
Greensboro, NC 27420

October 29, 2010

Venoice Williams Marrone
224 So Bentley Ave
Los Angeles CA 90049

RE#          JF5565795
Insured:     Venoice Williams Marrone

Dear Venoice Williams Marrone:

This letter is to inform you that a viatical or life settlement company has
requested information on a life insurance policy that insures your life. A viatical
or life settlement company is a business that purchases a policy from a
policyholder and may sell to investors the rights to collect the death benefit.

Since you are not the policyholder, we may not be able to provide you with
specific information about this policy. However, if you have any concerns
pertaining to this viatical or life settlement transaction, please contact Lincoln
Financial Group at 1-800-487-1485.

Sincerely,

Pam McBryde
Pam McBryde
Business Expeditor

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | CASE NUMBER |
|---|---|
| Tony Marrone, et al; | CV13-6368-SJO(Ex) |
| PLAINTIFF(S) | |
| v. | |
| Imperial Holdings, et al; | **NOTICE TO PARTIES OF COURT-DIRECTED ADR PROGRAM** |
| DEFENDANT(S) | |

## NOTICE TO PARTIES:

It is the policy of this Court to encourage settlement of civil litigation when such is in the best interest of the parties. The Court favors any reasonable means, including alternative dispute resolution (ADR), to accomplish this goal. *See* Civil L.R. 16-15. Unless exempted by the trial judge, parties in all civil cases must participate in an ADR process before trial. *See* Civil L.R. 16-15.1.

The district judge to whom the above-referenced case has been assigned is participating in an ADR Program that presumptively directs this case to either the Court Mediation Panel or to private mediation. *See* General Order No. 11-10, §5. For more information about the Mediation Panel, visit the Court website, www.cacd.uscourts.gov, under "ADR."

Pursuant to Civil L.R. 26-1(c), counsel are directed to furnish and discuss with their clients the attached ADR Notice To Parties *before* the conference of the parties mandated by Fed.R.Civ.P. 26(f). Based upon the consultation with their clients and discussion with opposing counsel, counsel must indicate the following in their Joint 26(f) Report: 1) whether the case is best suited for mediation with a neutral from the Court Mediation Panel or private mediation; and 2) when the mediation should occur. *See* Civil L.R. 26-1(c).

At the initial scheduling conference, counsel should be fully prepared to discuss their preference for referral to the Court Mediation Panel or to private mediation and when the mediation should occur. The Court will enter an Order/Referral to ADR at or around the time of the scheduling conference.

Clerk, U. S. District Court

August 30, 2013

Date

By    C. Sawyer

Deputy Clerk

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### NOTICE TO PARTIES: COURT POLICY ON SETTLEMENT
### AND USE OF ALTERNATIVE DISPUTE RESOLUTION (ADR)
**Counsel are required to furnish and discuss this Notice with their clients.**

Despite the efforts of the courts to achieve a fair, timely and just outcome in all cases, litigation has become an often lengthy and expensive process. For this reason, it is this Court's policy to encourage parties to attempt to settle their disputes, whenever possible, through alternative dispute resolution (ADR).

ADR can reduce both the time it takes to resolve a case and the costs of litigation, which can be substantial. ADR options include mediation, arbitration (binding or non-binding), neutral evaluation (NE), conciliation, mini-trial and fact-finding. ADR can be either Court-directed or privately conducted.

The Court's ADR Program offers mediation through a panel of qualified and impartial attorneys who will encourage the fair, speedy and economic resolution of civil actions. Panel Mediators each have at least ten years of legal experience and are appointed by the Court. They volunteer their preparation time and the first three hours of a mediation session. This is a cost-effective way for parties to explore potential avenues of resolution.

This Court requires that counsel discuss with their clients the ADR options available and instructs them to come prepared to discuss the parties' choice of ADR option (settlement conference before a magistrate judge; Court Mediation Panel; private mediation) at the initial scheduling conference. Counsel are also required to indicate the client's choice of ADR option in advance of that conference. *See* Civil L.R. 26-1(c) and Fed.R.Civ.P. 26(f).

Clients and their counsel should carefully consider the anticipated expense of litigation, the uncertainties as to outcome, the time it will take to get to trial, the time an appeal will take if a decision is appealed, the burdens on a client's time, and the costs and expenses of litigation in relation to the amounts or stakes involved.

With more than 15,000 civil cases filed in the District in 2012, less than 1 percent actually went to trial. Most cases are settled between the parties; voluntarily dismissed; resolved through Court-directed or other forms of ADR; or dismissed by the Court as lacking in merit or for other reasons provided by law.

For more information about the Court's ADR Program, the Mediation Panel, and the profiles of mediators, visit the Court website, www.cacd.uscourts.gov, under "ADR."

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL COVER SHEET**

| I. (a) PLAINTIFFS ( Check box if you are representing yourself ☐ ) | DEFENDANTS ( Check box if you are representing yourself ☐ ) |
|---|---|
| TONY MARRONE, as the TRUSTEE OF THE MARRONE FAMILY 2007-1 IRREVOCABLE LIFE INSURANCE TRUST-2 | IMPERIAL HOLDINGS, INC.; IMPERIAL PREMIUM FINANCE, LLC; IMPERIAL LIFE SETTLEMENTS, LLC; PORTFOLIO FINANCIAL SERVICIG COMPANY, LLC; BANK OF UTAH; THE LINCOLN NATIONAL LIFE INSURANCE COMPANY; and DOES 1 through 10, inclusive |
| (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)<br><br>David P. Beitchman SBC 198953<br>BEITCHMAN & ZEKIAN, P.C.<br>16130 Ventura Blvd., Suite 570, Encino, CA 91436<br>Tel. (818) 986-9100;  Fax (818) 986-9119 | (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.) |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1. U.S. Government Plaintiff

☐ 2. U.S. Government Defendant

☐ 3. Federal Question (U.S. Government Not a Party)

☒ 4. Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES**-For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1. Original Proceeding

☐ 2. Removed from State Court

☐ 3. Remanded from Appellate Court

☐ 4. Reinstated or Reopened

☐ 5. Transferred from Another District (Specify)

☐ 6. Multi-District Litigation

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes ☐ No (Check "Yes" only if demanded in complaint.)

**CLASS ACTION under F.R.Cv.P. 23:** ☐ Yes ☒ No   ☐ **MONEY DEMANDED IN COMPLAINT:** $ _____

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

28 U.S.C. Section 1332(a)

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | REAL PROPERTY CONT. | IMMIGRATION | PRISONER PETITIONS | PROPERTY RIGHTS |
|---|---|---|---|---|---|
| ☐ 375 False Claims Act | ☐ 110 Insurance | ☐ 240 Torts to Land | ☐ 462 Naturalization Application | **Habeas Corpus:** | ☐ 820 Copyrights |
| ☐ 400 State Reapportionment | ☐ 120 Marine | ☐ 245 Tort Product Liability | ☐ 465 Other Immigration Actions | ☐ 463 Alien Detainee | ☐ 830 Patent |
| ☐ 410 Antitrust | ☐ 130 Miller Act | ☐ 290 All Other Real Property | | ☐ 510 Motions to Vacate Sentence | ☐ 840 Trademark |
| ☐ 430 Banks and Banking | ☐ 140 Negotiable Instrument | **TORTS** | **TORTS** | ☐ 530 General | **SOCIAL SECURITY** |
| ☐ 450 Commerce/ICC Rates/Etc. | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | **PERSONAL INJURY** | **PERSONAL PROPERTY** | ☐ 535 Death Penalty | ☐ 861 HIA (1395ff) |
| ☐ 460 Deportation | | ☐ 310 Airplane | ☒ 370 Other Fraud | **Other:** | ☐ 862 Black Lung (923) |
| ☐ 470 Racketeer Influenced & Corrupt Org. | ☐ 151 Medicare Act | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 540 Mandamus/Other | ☐ 863 DIWC/DIWW (405 (g)) |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Vet.) | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 550 Civil Rights | ☐ 864 SSID Title XVI |
| ☐ 490 Cable/Sat TV | | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 555 Prison Condition | ☐ 865 RSI (405 (g)) |
| ☐ 850 Securities/Commodities/Exchange | ☐ 153 Recovery of Overpayment of Vet. Benefits | ☐ 340 Marine | **BANKRUPTCY** | ☐ 560 Civil Detainee Conditions of Confinement | **FEDERAL TAX SUITS** |
| ☐ 890 Other Statutory Actions | ☐ 160 Stockholders' Suits | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | **FORFEITURE/PENALTY** | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 891 Agricultural Acts | ☐ 190 Other Contract | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 871 IRS-Third Party 26 USC 7609 |
| ☐ 893 Environmental Matters | ☐ 195 Contract Product Liability | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | ☐ 690 Other | |
| ☐ 895 Freedom of Info. Act | ☐ 196 Franchise | ☐ 360 Other Personal Injury | ☐ 440 Other Civil Rights | **LABOR** | |
| ☐ 896 Arbitration | **REAL PROPERTY** | ☐ 362 Personal Injury-Med Malpratice | ☐ 441 Voting | ☐ 710 Fair Labor Standards Act | |
| ☐ 899 Admin. Procedures Act/Review of Appeal of Agency Decision | ☐ 210 Land Condemnation | ☐ 365 Personal Injury-Product Liability | ☐ 442 Employment | ☐ 720 Labor/Mgmt. Relations | |
| | ☐ 220 Foreclosure | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | ☐ 443 Housing/ Accomodations | ☐ 740 Railway Labor Act | |
| ☐ 950 Constitutionality of State Statutes | ☐ 230 Rent Lease & Ejectment | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 445 American with Disabilities-Employment | ☐ 751 Family and Medical Leave Act | |
| | | | ☐ 446 American with Disabilities-Other | ☐ 790 Other Labor Litigation | |
| | | | ☐ 448 Education | ☐ 791 Employee Ret. Inc. Security Act | |

FOR OFFICE USE ONLY:  Case Number: _____

**CV13- 6368**

AFTER COMPLETING PAGE 1 OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED ON PAGE 2.

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES**: Has this action been previously filed in this court and dismissed, remanded or closed?    ☒ NO    ☐ YES

If yes, list case number(s): _____

**VIII(b). RELATED CASES**: Have any cases been previously filed in this court that are related to the present case?    ☒ NO    ☐ YES

If yes, list case number(s): _____

Civil cases are deemed related if a previously filed case and the present case:

(Check all boxes that apply)    ☐ A. Arise from the same or closely related transactions, happenings, or events; or

☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or

☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or

☐ D. Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

**IX. VENUE**: (When completing the following information, use an additional sheet if necessary.)

(a) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named plaintiff resides.

☐ Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles | . |

(b) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named defendant resides.

☐ Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
|  | Delaware, Utah, Florida, Indiana |

(c) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** claim arose.
**NOTE: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles |  |

***Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties**
**Note**: In land condemnation cases, use the location of the tract of land involved.

**X. SIGNATURE OF ATTORNEY (OR SELF-REPRESENTED LITIGANT):** _____    DATE: 8/29/2013

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405 (g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES JUDGES

This case has been assigned to District Judge _____ S. James Otero _____ and the assigned Magistrate Judge is _____ Charles F. Eick _____ .

The case number on all documents filed with the Court should read as follows:

## CV13-6368-SJO(Ex)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge.

Clerk, U. S. District Court

August 30, 2013

Date

By   C. Sawyer

Deputy Clerk

---

### NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

**Subsequent documents must be filed at the following location:**

[x] Western Division
312 N. Spring Street, G-8
Los Angeles, CA 90012

[ ] Southern Division
411 West Fourth St., Ste 1053
Santa Ana, CA 92701

[ ] Eastern Division
3470 Twelfth Street, Room 134
Riverside, CA 92501

**Failure to file at the proper location will result in your documents being returned to you.**

CV-18 (08/13)                    NOTICE OF ASSIGNMENT TO UNITED STATES JUDGES

Name & Address: David P. Beitchman, SBN198953
Beitchman & Zekian, P.C.
16130 Ventura Blvd Ste 570, Encino CA 91436
Tel. (818)986-9100 Facsimile (818) 986-9119
dbeitchman@bzlegal.com
Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| Tony Marrone, as the Trustee of the Marrone Family 2007-1 Irrevocable Life Insurance Trust -2 <br><br> PLAINTIFF(S) <br><br> v. <br><br> Imperial Holdings, Inc.; Imperial Premium Finance, LLC; Imperial Life Settlements, LLC; See attachment <br><br> DEFENDANT(S). | CASE NUMBER <br><br> **CV13- 6368** SJO (Ex) <br><br><br> **SUMMONS** |
|---|---|

TO:     DEFENDANT(S):

A lawsuit has been filed against you.

Within __21__ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff's attorney, David P. Beitchman_____, whose address is Beitchman & Zekian, P.C., 16130 Ventura Blvd Ste 570, Encino CA 91436_____. If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.

Dated: 8- 30- 13

Clerk, U.S. District Court

By_____
Deputy Clerk
*(Seal of the Court)*

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States.  Allowed 60 days by Rule 12(a)(3)].*

**Attachment to Summons**

Additional Defendants:

PORTFOLIO FINANCIAL SERVICING COMPANY, LLC; BANK OF UTAH; THE LINCOLN NATIONAL LIFE
INSURANCE COMPANY; and DOES 1 through 10, inclusive

Name & Address: David P. Beitchman, SBN198953
Beitchman & Zekian, P.C.
16130 Ventura Blvd Ste 570, Encino CA 91436
Tel. (818)986-9100 Facsimile (818) 986-9119
dbeitchman@bzlegal.com
Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Tony Marrone, as the Trustee of the Marrone Family 2007-1 Irrevocable Life Insurance Trust -2 <br><br> PLAINTIFF(S) <br> v. <br><br> Imperial Holdings, Inc.; Imperial Premium Finance, LLC; Imperial Life Settlements, LLC; See attachment <br><br> DEFENDANT(S). | CASE NUMBER <br><br> **CV13- 6368** SJO (EX) <br><br><br> **SUMMONS** |

TO:   DEFENDANT(S):

A lawsuit has been filed against you.

Within __21__ days after service of this summons on you (not counting the day you received it), you
must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint
☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer
or motion must be served on the plaintiff's attorney, David P. Beitchman _____, whose address is
Beitchman & Zekian, P.C., 16130 Ventura Blvd Ste 570, Encino CA 91436 _____. If you fail to do so,
judgment by default will be entered against you for the relief demanded in the complaint.  You also must file
your answer or motion with the court.

Dated: __8 - 30 - 13__

Clerk, U.S. District Court

By: _____
CHRIS SAWYER
Deputy Clerk

*(Seal of the Court)*

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States.  Allowed 60 days by Rule 12(a)(3)].*

**Attachment to Summons**

Additional Defendants:

PORTFOLIO FINANCIAL SERVICING COMPANY, LLC; BANK OF UTAH; THE LINCOLN NATIONAL LIFE INSURANCE COMPANY; and DOES 1 through 10, inclusive